COMMITTEE ON PROFESSIONAL
ETHICS AND CONDUCT OF THE
IOWA STATE BAR ASSOCIATION,
Complainant,

v.

Thomas G. YATES, Respondent.

No. 87–1353.

Supreme Court of Iowa.

March 16, 1988.

James E. Gritzner and Kasey W. Kincaid of Nyemaster, Goode, McLaughlin, Emery & O'Brien, P.C., Des Moines, for complainant.

Thomas G. Yates, Cathedral City, Cal., respondent.

Considered by McGIVERIN, C.J., and HARRIS, CARTER, NEUMAN and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

Pursuant to Iowa Supreme Court Rule 118.10, we review the report of the Grievance Commission in this attorney disciplinary proceeding against respondent, Thomas G. Yates. The Committee on Professional Ethics and Conduct brought this complaint against Yates for numerous alleged violations of the Iowa Code of Professional Responsibility for Lawyers. After a hearing before the commission which Yates failed to attend, the commission unanimously recommended that Yates' license to practice law in Iowa be revoked. We agree with the commission's recommendation and revoke respondent's license to practice law.

When no appeal is taken from the commission's recommendation, we review de novo the record made before the commission and determine the matter. *See* Iowa Sup.Ct.R. 118.10.

I. *Facts.* Respondent's conduct as an attorney in recent years has been outrageous. The counts against him range from commingling client funds with personal funds to outright fraud.

A. In section one of its report, the commission found that Yates made personal use of funds given to him by the executor of a decedent's estate to pay the estate's federal taxes. Alston Parker hired Yates in 1976 to handle the estate of his late wife. During the estate proceedings, Parker wrote a check for $23,000 and gave it to Yates to cover the outstanding federal estate tax. The memo designation on the check read "Fed. Estate Tax," and the check was made payable to "Thomas Yates Special Account." Bank records indicate this account really was Yates' personal account.

Yates used the money for his own purposes. Over the ensuing months, the Internal Revenue Service (IRS) repeatedly questioned Parker about the estate tax delinquency. Each time, Parker would in turn question Yates, who repeatedly assured Parker that he was handling the problem. It was not until the IRS put a tax lien on Parker's property that Yates admitted to Parker that he had converted the funds to

his own use. Yates then made the payment to the IRS.

When questioned about this matter by our client security commission auditor, Yates attempted to excuse the delay in paying the Parker estate tax as unavoidable due to an on-going IRS audit. When later confronted with bank records detailing his own use of the funds, Yates changed his story, characterizing the $23,000 check as a loan. Alston Parker stated during deposition that the money was not a loan.

Parker had been a long-time client of Yates and was reluctant to believe Yates was acting improperly. At the insistence of his daughter, Patricia Sorensen, Parker reported Yates' conduct to the client security commission, the ethics committee and the Attorney General's office.

B. Section two of the commission's report notes that after Yates learned they were to testify against him, Yates sent threatening letters to Parker and Sorensen demanding half a million dollars in slander and libel damages from each of them for the alleged injury done to his reputation by their "activities." Yates did file a suit against Parker for these damages, but he has done nothing to prosecute his claim and has twice failed to appear at a deposition set by Parker's attorney.

C. Section three of the commission's report concerns Yates' apparent attempt to defraud an elderly woman out of substantial amounts of money, nipped only when her relatives noticed her checking account overdrawn. Yates received a total of $62,000 from Mrs. Dorothy Gries, an elderly widow, as payment in a bogus real estate installment contract between Yates and Gries. The real estate and equipment named in the sales contract are, and always have been, owned by individuals other than Yates or Gries. When this scheme was discovered by Mrs. Gries' relatives, Yates repaid the entire sum.

D. The fourth section details Yates' dealings with Harold and Fern Scherner. Yates induced the Scherners to invest $5000 in "Burger Baron, Inc.," a non-existent corporation. He sent them a $500 check in the guise of an "interest payment" but the Scherners have received nothing more on their "investment." Yates also prepared the Scherners' federal income tax returns for the next few years and took deductions for them based upon the bogus investments.

Additionally, Yates borrowed $5000 from the Scherners in 1985 without advising them of his financial condition or of the need to consult other counsel. Neither of the two checks Yates subsequently wrote to the Scherners to repay the loan were honored by the bank because Yates had no funds.

E. In a fifth section of the commission's report, Yates is attributed with converting $127,000 in funds belonging to a single elderly client over a ten-year period. Of the total, $30,000 was to have been invested by Yates on behalf of his client in municipal water bonds and the remainder was designated for a trust account. All of the money ended up in Yates' personal accounts and none of it has been returned to the client.

F. According to a sixth section of the commission's report, Mrs. Shirley Whitford approached Yates seeking a way to shelter a recent $40,000 inheritance from her husband who was suffering from alcoholism at the time. Yates prepared an irrevocable trust agreement for Whitford in which Forrest Vogt was named as trustee and the funds were placed in a trust account.

Yates then convinced Whitford to invest her funds with certain unnamed wealthy farmers who needed short-term cash. In fact, Whitford's money was never loaned out. Yates made personal use of almost all of the money in the trust account. To conceal his use of her money, Yates sent Whitford monthly interest payments, supposedly coming from the farmers who had borrowed from the trust account.

In a later transaction, Yates did the legal work for Whitford when she sold her mother's home. Yates convinced Whitford to loan him $1000 out of the sale proceeds. Neither that money, nor any of the trust funds, have been repaid.

In none of the foregoing transactions did Yates ever advise the clients he was dealing with to seek other legal advice when such was clearly called for by the situation and by our ethics rules.

G. The final section of the report adds that Yates has threatened the trustee for Mrs. Whitford's trust by implying that he acted in complicity with Yates in defrauding Whitford. The evidence shows that Yates never explained the duties of a trustee to Vogt. Yates assured Vogt that he would handle all the legal matters and that Vogt need only deposit Whitford's interest checks for her and make sure she did not write checks on the trust account over $1000 without Vogt's approval.

For his services, Yates paid Vogt $1400 in trustee fees over a two-year period. Those fees are the basis of Yates' assertion of complicity. A letter implying Vogt's complicity was mailed just before the Grievance Commission hearings were to be held, presumably to influence Vogt's testimony before the commission. Notably, toward the end of the second year when the "interest payment" checks to Whitford stopped being honored by the bank, Vogt questioned Yates' handling of the trust. He asked Yates whether another lawyer ought to be consulted. Not surprisingly, Yates strongly counseled against involving another attorney.

II. *Motion to Set Aside Hearing.* The above findings and conclusions concerning Yates were derived from evidence presented before the Grievance Commission. *See* Iowa Sup.Ct.R. 118.7. Yates, now residing in California, filed a motion with this court to set aside that hearing before the commission and its result, claiming that he was not notified of the hearing date or of the identity of the complainant's witnesses.

Yates' motion to set aside the hearing is groundless. The record conclusively shows that after two earlier hearing dates were continued in this action, Yates was informed of the third date by personal service, restricted certified mail and regular mail. Concerning the committee's witnesses, the Grievance Commission rules do not require that the complainant's witnesses be listed in the hearing notice sent to the respondent. *See* Grievance Commission Rule 9. Further, Yates sent an interrogatory to the committee, after the original notice of the complaint was served, requesting the names and addresses of the witnesses supporting the committee's allegations. In response to Yates' interrogatory, the committee listed most of the witnesses it later called at the hearing. Based upon this record, we find no merit in Yates' motion to set aside the hearing and its result. The motion is hereby overruled.

III. *License revocation.* Based upon the above evidence, the commission concluded that Yates had committed seven violations each of DR 1–102(A)(1) (violation of a disciplinary rule), DR 1–102(A)(3) (engaging in illegal conduct involving moral turpitude), DR 1–102(A)(4) (engaging in dishonest, fraudulent, misrepresentative or deceitful conduct) and DR 1–102(A)(6) (engaging in any conduct that adversely reflects on the attorney's fitness to practice law); three violations each of DR 9–102(A) (requiring separate trust accounts for client's funds), DR 9–102(B) (requiring an attorney to keep specific records on a client's funds in the lawyer's trust account and to notify the client of any transactions concerning the client's funds), EC 9–5 (cautioning against commingling funds to avoid even the appearance of impropriety) and EC 9–6 (lawyer's duty to act with integrity as to reflect credit on the legal profession); six violations of EC 1–5 (maintenance of high standards of professional conduct); four violations of DR 5–104(A) (restraint against entering a business transaction with a client without full disclosure and client's consent); and two violations of DR 1–102(A)(5) (engaging in conduct that is prejudicial to the administration of justice).

The evidence against Yates is overwhelming. We stated in *Committee on Professional Ethics & Conduct v. Piazza,* 389 N.W.2d 382, 383 (Iowa 1986), that we look for a convincing preponderance of the evidence to support the commission's findings of misconduct. The facts in this case speak for themselves. We are sorrowed by

Yates' transgressions and we conclude that a convincing preponderance of evidence shows he is responsible for each and every violation found against him by the commission.

In *Committee on Professional Ethics & Conduct v. Silver*, 395 N.W.2d 877 (Iowa 1986), we revoked an attorney's license to practice law for a single incident of conversion. Among other serious ethical violations, Yates has repeatedly converted client's funds. Based upon our de novo review of the record made before the commission, we revoke Yates' license to practice law in Iowa. *See* Iowa Sup.Ct.Rule 118.10. Costs are taxed against respondent pursuant to Iowa Supreme Court Rule 118.22.

LICENSE REVOKED.