COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Complainant,

v.

Robert J. BAUDINO, Jr., Respondent.

No. 89–1225.

Supreme Court of Iowa.

March 21, 1990.

As Corrected April 16, 1990.
Rehearing Denied April 20, 1990.
Amended Petition for Rehearing
Denied May 23, 1990.

Charles L. Harrington, Des Moines, for complainant.

A. Arthur Davis of Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, for respondent.

SNELL, Justice.

Professional ethics violations by lawyers who fail to file their income tax returns on time abound in our case reports. This is another one. Appellant Robert J. Baudino, Jr., appeals the recommendation of the Grievance Commission that his license to practice law be suspended for six months. He argues his case is different from others. From that premise, he questions our purpose, our standards, our notice to lawyers, our consistency and our fairness in imposing sanctions for these violations. Appellant suggests the court should declare "we can do better."

After a full hearing at which Baudino was represented by counsel, the commission found a failure to timely file his federal and Iowa income tax returns for 1984, 1985 and 1986. The 1984 returns were filed late after he received two extensions. The same is true of the 1985 returns. The 1986 return was filed late after receiving an extension. The commission decided that these acts "adversely reflect on his fitness

to practice law and violate EC 1–5 and DR 1–102(A)(1), (5), and (6)." The commission also found Baudino falsely certified that he had filed these returns on the client security questionnaire and thereby violated DR 1–102(A)(1) and (4).

The Iowa Code of Professional Responsibility, Canon I, EC 1–5 states:

A lawyer should maintain high standards of professional conduct and should encourage fellow lawyers to do likewise. He should be temperate and dignified, and he should refrain from all illegal and morally reprehensible conduct. Because of his position in society, even minor violations of law by a lawyer may tend to lessen public confidence in the legal profession. Obedience to law exemplifies respect for law. To lawyers especially, respect for the law should be more than a platitude.

Disciplinary rule DR 1–102 Misconduct states:

(A) A lawyer shall not:

(1) Violate a disciplinary rule.

. . . .

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law.

Baudino argued there and here that his acts amounted to a mere misinterpretation of the tax law and a misunderstanding of the questions asked by the Client Security Commission.

Admitted to the practice of law in 1978, Robert Baudino has practiced in Des Moines since then and currently is a shareholder in his law firm. He has been active in professional organizations generally and in his specialty. A lecturer in health care law at seminars and at Drake Law School, he has also generously served his church in several leadership positions.

His problems started when he decided to do his own tax return. He physically set out a big box full of "all the papers and

things" and then did the returns in handwriting. Some time prior he had read language on an Internal Revenue Service form (form 8176), sent out as a notice to taxpayers as follows:

If you paid tax for this period, had tax withheld from your income or had credits that would give you a refund, you must file a return within three years from the date the return was due to get a refund.

Baudino did some rough calculations to determine his tax liability for 1984 income and figured he had a refund coming. He knew the law corporation in which he was a shareholder had withheld money for taxes from his earnings. The corporation had also filed a corporate tax return, a partnership return, supplied him with copies, gave him W-2 statements and a K-1 statement showing investment tax credits. Reasoning that the federal and state governments owed him money and they already had information from his employer regarding his income, he concluded that he did not have to file a personal income tax return for three years. The three years ran from whenever the return was due, he thought.

Notwithstanding this analysis, Baudino applied for and received extensions to file his 1984 returns. An extension to file the federal return was granted to August 15, 1985; a second extension was requested but no copy of a second extension was offered in evidence. The federal return was filed November 26, 1985. The State of Iowa granted an extension to August 30, 1985. Baudino thought he got another extension to October 31, 1985. He filed the state return for 1984 on October 31, 1986.

Extensions were sought and obtained for the 1985 federal return to October 15, 1986. This return was filed on July 27, 1987. The Iowa return for 1985 income had a due date extension first to August 30, 1986, then to October 31, 1986. This return was filed on March 10, 1988.

Baudino acknowledges that all of these returns were filed after the extended due dates. In fact, he stated as "absolutely correct" that he did not even calculate the Iowa tax due on 1984 income until September or October of 1986, notwithstanding the extension granted to him ran out October 31, 1985.

The story surrounding his 1986 return is different. For this year he knew he did not have a refund coming. His law practice had been very profitable, garnering him an adjusted gross income over $100,000. He thought he owed about $14,000 to the federal government in additional tax and about $4000 more to the State of Iowa. He prepared these returns and gave them in envelopes to his secretary in September 1987. He did not enclose any checks in payment of tax, however. His custom was to let the tax authorities calculate the tax and he would pay it when they let him know the final amount due.

Baudino did not hear anything from the tax authorities until March 1988, when someone from IRS informed him the 1986 tax return had not been received. On investigation, Baudino found the tax returns were still in his office. He took them to the postal department March 7, 1988.

Baudino's explanation for the late filing of the 1986 return is to blame his secretary. He was having trouble with her and eventually she left for other employment. His explanation for seeking extensions, even after deciding he had three years to file a return, is "an extra bit of precaution or safety on my part." No reason is proffered for abjuring this safety net thought so important.

That aside, Baudino insists that his mistaken interpretation of the tax law was the nonculpable mistake of a lawyer not knowledgeable in the field who relied on language put out by the IRS itself. He fortifies his position by showing that the IRS actually refunded more money to him based on his 1984 income than he had claimed. Later, the IRS recalculated and determined that no refund was due and that $2,298.36 more money for taxes was owed for 1984 income than had been paid.

 This brief history of his 1984 income tax liability illustrates the illogic of Baudino's argument. His idea that he had three years to file a personal return as-

sumes the validity of his judgment that he is entitled to a refund. It also assumes that since a corporate return was filed showing his law practice income that the government had received all the information to which it was entitled. Ignored is the fact that he could have had unreported income from many other sources that would be taxable. Ignored is the government's right to know about total income, its right to audit and to question interpretations made by the taxpayer of the tax laws. According to Baudino's reasoning, if he elected to forego his refund, he would not have to file a personal return for 1984 for three years. Were that the law, the government would not have access to this information during this period, except per chance.

Boiled down to the raw meat of Baudino's argument, we see that if a taxpayer thinks a refund from the government is possible and some tax information has been filed, then the taxpayer has no further duty to file a return for three years. To state the proposition is to witness its denial. No tax system so structured could long last.

Regarding his answers on the Client Security questionnaire, Baudino acknowledges that they were incorrect given his current understanding of the tax law. He tries to justify his answers as not being false by reiterating his prior argument. He says that since corporate and partnership tax returns had been filed with both the IRS and the State of Iowa showing what his income was for each year, he did not believe further returns were due for three years. Consequently, he answered, "yes" without further explanation to both questions: "Did you file your 1984 federal income tax return?" and "Did you file your 1984 Iowa state income tax return?" The same answers were given to questions about filing 1985 and 1986 federal and state returns.

The commission did not find Baudino's belief to be credible, nor do we. The Committee on Professional Ethics and Conduct of the Iowa State Bar Association, as complainant, points out that the only tax returns filed when the questions were answered were corporate and partnership law firm returns. The questionnaire is addressed to every Iowa lawyer as an individual; it is not addressed to law firms. The questions asked about filing "your" return. No reference is made in the questions to corporate or partnership returns nor can any legitimately be inferred. Even if Baudino's construction of the tax law was correct, his answers here were false and misleading. The natural conclusion of the assistant court administrator in charge of client security in reading Baudino's answers would be that he had filed his personal tax return, when in fact he had not.

We have repeatedly held that false statements on our client security questionnaire will result in disciplinary action. *Committee on Professional Ethics & Conduct v. Jay,* 430 N.W.2d 115 (Iowa 1988); *Committee on Professional Ethics & Conduct v. Morris,* 427 N.W.2d 458 (Iowa 1988); *Committee on Professional Ethics & Conduct v. Ramey,* 424 N.W.2d 435 (Iowa 1988); *Committee on Professional Ethics & Conduct v. Summa,* 416 N.W.2d 690 (Iowa 1987). It is the intent of the Iowa Supreme Court Rules 121.4(b)(c) that the required responses be verified by the attorney as being accurate. *Committee on Professional Ethics & Conduct v. Munger,* 375 N.W.2d 248, 251 (Iowa 1985). In *Munger,* the lawyer claimed a secretary incorrectly checked the "yes" box, followed by his signing and filing it without reading it. The court held this was an inadequate excuse for making the false statement. "On occasion this all too familiar excuse may be valid but it is one which experienced lawyers and judges view with unbounded skepticism and never with admiration." *Committee on Professional Ethics & Conduct v. Postma,* 430 N.W.2d 387, 389 (Iowa 1988). We find no significant difference in the case at bar. Whether it be deemed intentional misrepresentation or negligent misrepresentation, as argued here, the effect is to mislead rather than to inform. *Cf. Committee on Professional Ethics & Conduct v. Zimmerman,* 354 N.W.2d 235, 237 (Iowa 1984). *See also Committee on Professional Ethics & Conduct v. Bitter,* 279 N.W.2d 521, 527 (Iowa 1979) (where the act was deemed negligent but not egre-

gious enough to be a misrepresentation). Under the circumstances of this case we find the disciplinary rules were violated as charged.

The commission also found that Baudino was a sincere witness, speaking with conviction and candor, but that his understanding of the law was not reasonable. It found that a reasonable attorney could not interpret the IRS statement to allow three years to file a return and that his ignorance of the law was not credible. The commission found that such ignorance of the law by a lawyer can only undermine public confidence in the profession.

We have many times repeated the principles which apply to disciplinary cases based on failure to file tax returns on time. License suspensions have been imposed ranging from sixty days to three years. *Committee on Professional Ethics & Conduct v. Jay*, 430 N.W.2d 115, 118 (Iowa 1988); *Committee on Professional Ethics & Conduct v. Davison*, 414 N.W.2d 97, 99–100 (Iowa 1987); *Committee on Professional Ethics & Conduct v. Crawford*, 351 N.W.2d 530, 531–32 (Iowa 1984).

■■■ Our purpose in imposing sanctions is to deter other lawyers from similar conduct; to assure the public that we will maintain the ethics of the profession; and to appropriately reflect our view of the attorney's fitness to practice law. *Committee on Professional Ethics & Conduct v. Belay*, 420 N.W.2d 783, 784 (Iowa 1988); *Committee on Professional Ethics & Conduct v. Getscher*, 356 N.W.2d 557, 558 (Iowa 1984). The standard we apply tailors the discipline to the circumstances of each case, giving respectful consideration to the recommendation of the commission and also taking into account our decisions in earlier similar cases. *Committee on Professional Ethics & Conduct v. Klein*, 394 N.W.2d 358, 361 (Iowa 1986).

Concerning standards, Baudino introduced evidence calculated to question the applicability of our standards to this case. Professor Geoffrey C. Hazard, Jr., is a professor of law at Yale Law School. He teaches civil procedure and an advanced course in professional responsibility. He stated that he considered responsibilities under the tax law to be very important; one should be very honest and faithful in paying income taxes. He said it is an important responsibility particularly for lawyers. Professor Hazard stated that Iowa had a deserved reputation of having a good enforcement apparatus. The resources, care and concern that are devoted to seriously pursue questions about professional responsibility and integrity make Iowa's reputation very strong. The income tax laws are very complicated, he thought, and one can get confused about it. Assuming Baudino's statements about his state of mind are accepted, he opined that it did not reflect on fidelity to duty or dishonesty.

Over objection that it was an improper subject of expert opinion, Professor Hazard gave his opinion to the commission as to sanctions. That opinion is that Baudino's acts were not an indifference or evasion, but arose from a serious confusion resulting in nonpayment on time, and were not a flagrant disregard of income tax responsibilities. He thought it inconsistent with disciplinary sanctions to say that because it involves income tax it must result in suspension.

Forty-eight years ago we said:

When a standard, or a measure, or a capacity has been fixed by law, no witness, whether expert or nonexpert, nor however qualified, is permitted to express an opinion as to whether or not the person or the conduct in question measures up to that standard.

*Grismore v. Consolidated Prods. Co.*, 232 Iowa 328, 361, 5 N.W.2d 646, 663 (1942). Aware of this rule of law, Professor Hazard was quick to limit his testimony by stating that he did not mean to make any final judgment on credibility; "that's not my function." He viewed his role as giving an expert opinion on matters of attorney discipline and sanctions. Notwithstanding his disclaimer, his testimony clearly was directed to and answered the ultimate question to be decided by the commission. He said a sanction in this case would be inconsistent with generally recognized

standards of what is justice and professional discipline.

We think Professor Hazard trod heavily with his academic boots on the *Grismore* rule. To say the rule survived is more a resurrection than an affirmation.

Despite questionable admissibility, we note that Professor Hazard's advice to the commission is grounded on the assumption that Baudino was truthful about his confusion as to the filing date on the 1040 and that his confusion is accepted as reflecting his state of mind. Thus, Professor Hazard proceeds from a hypothesis not reached or accepted by the commission, *i.e.*, that this confused state of mind is an acceptable legal excuse.

It matters not for our purposes whether Baudino actually believed the interpretation now put forward in justification for his failure to file tax returns on time. The commission found that even if Baudino is a credible witness, his understanding of the law was not reasonable. The commission said:

> A reasonable attorney could not interpret the IRS statement regarding the time to request a refund as an extension of time for filing a return for a period of three years.

Our review is to determine if the bar association committee has proven the allegations by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Morris*, 427 N.W.2d 458, 459 (Iowa 1988). In our de novo review we find it has both as to the client security questionnaire and the tax return filings. *Committee on Professional Ethics & Conduct v. Summa*, 416 N.W.2d 690, 691 (Iowa 1987). Under some circumstances it might be reasonable for a layman to think there was a three-year filing time. But for one trained in logic and reason who has practiced those arts as a lawyer for many years it is not a reasonable belief. Baudino's whole defense to excuse his not filing personal returns and filing misleading answers with the Client Security Commission is based on the false premise that he acted reasonably. He did not. The conclusion that he did not have to file a personal return for three years should have alerted him as a lawyer that this idea was suspect. At the least, he should have checked it out with a professional tax counsel. For these reasons we find our standards of professional responsibility are applicable to Baudino's conduct and have been violated.

The suggestion made that this court's history in attorney disciplinary cases is a road of confusing results seeks to persuade by diversion. We have no doubt that a perceptive and resourceful lawyer can compare our cases and find sufficient material to claim inconsistencies. Whether these are real or fancied, we are satisfied that the individual circumstances of each case support its result. We are also satisfied that the underlying message is clear for any lawyer to understand. Members of this bar have been given notice for years to file tax returns on time, a matter of professional duty, or be subject to disciplinary action. This is neither unfair nor vague. The remedy in this area lies not with better direction from this court but in attention to the rules before rather than after the fact.

We suspend the license to practice law of Robert J. Baudino, Jr., indefinitely with no possibility for a reinstatement for six months. During the period of suspension he shall refrain from the practice of law as that term is defined in Iowa Supreme Court Rule 118.12.

Costs are assessed to respondent pursuant to Iowa Supreme Court Rule 118.22.

LICENSE SUSPENDED.

All Justices concur except HARRIS, J., who concurs specially, McGIVERIN, C.J., who concurs and joins the special concurrence, and SCHULTZ, J., who dissents, joined by LARSON, CARTER and LAVORATO, JJ.

HARRIS, Justice (concurring).

I concur in the majority opinion and write separately only to address matters raised in the dissent.

It is conceded that the respondent swore to false answers when certifying he had filed income tax returns he had not. This

fact reflects adversely on the respondent, and this reflection is not affected by how one views the appropriateness of the falsely answered questions. So long as the questions regarding income tax filings are asked, a false answer will, as it does in this case, reveal much concerning the character of a lawyer who answers it falsely.

I vigorously challenge the contention that we can neatly compartmentalize the truthfulness of this respondent. Could we seriously suppose that a lawyer who would falsely swear to a statement to a commission of this court would be any less likely to tell a "white" lie to his client or to another attorney? Nor do I agree that the false certification is in any way tempered because the situation places the lawyer in what the dissent characterizes as "a strong temptation to lie." The practice of law is honeycombed with temptations and the first requirement of a lawyer is to never yield to them.

The temptation to which the dissent refers proves the appropriateness of the income tax question on the annual report to the client security commission. Cheating on income taxes is dishonest and victimizes all other taxpayers. Income tax returns are the heart and lungs of our system of tax collections.

The usefulness of the legal profession rests upon the integrity and basic honesty of its members, subjective matters which are not easy to measure or to test. A time-honored method of testing credibility is to question persons on matters which can easily be proven or disproven. There is nothing unfair in asking attorneys to certify they have complied with a clear statutory duty which is required of all citizens.

It is disappointing that even an extremely small number of lawyers continue to fail to comply with our tax laws and are willing to falsely certify they have complied. But to abandon our policy at this time would adversely affect public confidence in our determination to police the profession. Abandonment would thus be unfair to the legal profession, which is composed almost entirely, though unfortunately not quite unanimously, of men and women of impeccable character who are meticulous about the requirements of law.

SCHULTZ, Justice (dissenting).

A majority of this court has imposed a six-month suspension of respondent's license to practice law for failure to timely file his tax returns and for false certification on client security questionnaires. I do not disagree with the determination that respondent violated rules of professional conduct nor is the sanction imposed inconsistent with the many suspensions imposed on lawyers for similar misconduct in the past. I believe, however, that the six-month suspension is excessive.

The majority opinion repeats our often-stated rule that the purpose in imposing sanctions is to deter other lawyers, assure the public that we will maintain the ethics of the profession and reflect our view of the attorney's fitness to practice law. In the seminal case involving a failure to file income tax returns, we stated that "[t]he ultimate issue before the commission was the fitness of respondent to practice his chosen profession." *Iowa State Bar Ass'n v. Kraschel,* 260 Iowa 187, 194, 148 N.W.2d 621, 625–26 (1967). In contrast, the majority in this case emphasizes the first two purposes of the sanction at the expense of its third and most important goal.

In the past we have relied heavily on deterrence as a justification for the sanction of suspension. In 1985 we observed: "As our cases will indicate, we are determined to continue to impose sanctions and, if necessary, to end tax violations by members of the profession, to increase the periods of suspensions." *Committee on Professional Ethics and Conduct v. Jones,* 368 N.W.2d 157, 157 (Iowa 1985). We repeated this admonition in *Committee on Professional Ethics and Conduct v. Piazza,* 389 N.W.2d 382, 383 (Iowa 1986) and in *Committee on Professional Ethics and Conduct v. Matias,* 397 N.W.2d 514, 515 (Iowa 1986).

This effort to eradicate this type of violation has been disappointing. Upon careful reflection, I believe that we must reexamine our dogmatic reliance upon the penalty

of suspension for the violation of failing to file timely tax returns.

We first examine what has occurred since 1967 when we decided *Kraschel.* In *Kraschel* while we recognized that not all jurisdictions have held that a lawyer's failure to file timely tax returns was an act of moral turpitude, we chose to say that it was. 260 Iowa at 197, 199, 148 N.W.2d at 627, 628. While I do not challenge the fifty-one decisions following *Kraschel* which used the same reasoning to find ethical violations,[1] I do question the imposition of a suspension as a matter of course in all fifty-two cases. Many of these cases involved tax fraud, criminal prosecution and other problems which justified the suspension. It is clear, however, that we have come to the point where a mere willful failure to file timely returns triggers the penalty of suspension, and the only issue now is the length of that suspension. This practice abandons our approach of viewing these discipline cases individually and ignores the ultimate issue of the lawyer's fitness to practice law.

It is apparent that our tough approach has not stopped lawyers from filing untimely returns. According to my unofficial count, from 1967 through 1983, we heard and imposed the sanction of suspension in twenty-three cases; from 1984 through 1989, we heard and imposed a suspension in twenty-nine cases. During the first period the average number of cases was less than one and one-half per year, while in the last five years, during and after our warnings of an increase in the length suspension, the number averaged nearly five cases per year. Admittedly, we do not know if this type of violation would have increased if our sanction had been less severe. It is also highly probable that the additional enforcement provided by our Client Security and Attorney Discipline Committee has added to the number of cases in recent years. If our purpose was to wipe out or nearly wipe out this form of misconduct, we have not met this goal.

It is obvious that our heavy policing of untimely tax filings is motivated, in part, by the shared embarrassment which all lawyers suffer when they see or hear in the news of the prosecution of lawyers and other tax preparers for failing to file returns. This dovetails with our concern about the public perception of lawyers. As times have changed and the complexity of the law increased, bar members have specialized and a greater number of them no longer prepare tax returns. The public is aware that many lawyers have no expertise in tax matters, whether in preparing a client's return or their own. Nevertheless, the public is not impressed with a lawyer, tax preparer or public official it knows does not file timely tax returns.

Our concern with how the public perceives our profession is flawed in a case such as this where it had no way of knowing that respondent had not filed his tax return until this proceeding made it public. Apparently state and federal tax authorities did not find that respondent's conduct warranted notifying the public by commencing a criminal action.[2] While the pub-

---

1. In the interest of brevity I have not cited all of the cases that have been decided since *Kraschel.* Most of the cases before 1987 have been summarized in *Committee on Professional Ethics and Conduct v. Crawford,* 351 N.W.2d 530, 531–32 (Iowa 1984) and *Committee on Professional Ethics and Conduct v. Davison,* 414 N.W.2d 97, 99–100 (Iowa 1987). Since *Davison* we have decided the following cases: *Committee on Professional Ethics and Conduct v. Summa,* 416 N.W.2d 690 (Iowa 1987); *Committee on Professional Ethics and Conduct v. Belay,* 420 N.W.2d 783 (Iowa 1988); *Committee on Professional Ethics and Conduct v. Bertelli,* 422 N.W.2d 175 (Iowa 1988); *Committee on Professional Ethics and Conduct v. Houser,* 423 N.W.2d 1 (Iowa 1988); *Committee on Professional Ethics and*

*Conduct v. Ramey,* 424 N.W.2d 435 (Iowa 1988); *Committee on Professional Ethics and Conduct v. Morris,* 427 N.W.2d 458 (Iowa 1988); *Committee on Professional and Conduct v. Jackson,* 429 N.W.2d 122 (Iowa 1988); *Committee on Professional Ethics and Conduct v. Jay,* 430 N.W.2d 115 (Iowa 1988); *Committee and Professional Ethics and Conduct v. Jones,* 441 N.W.2d 370 (Iowa 1989); *Committee on Professional Ethics and Conduct v. Clauss,* 445 N.W.2d 758 (Iowa 1989); *Committee on Professional Ethics and Conduct v. McMillen,* 449 N.W.2d 339 (Iowa 1989).

2. It is interesting to note that in the first twenty-three cases referred to previously, fifteen involved criminal prosecutions while of the last

lic may favorably regard our ferreting out of lawyers and sanctioning them, this policy is inappropriate when the lawyer's misconduct arises from personal activities rather than professional life.

The preeminent issue is whether respondent's conduct was so improper that it casts doubt on his fitness to practice law. In analyzing the severity of failing to file a timely tax return, I believe we need to look at the individual circumstances surrounding the conduct. Respondent's corporate law firm withheld taxes from his wages; consequently, most of his taxes were prepaid. He filed his 1984, 1985 and 1986 returns well past the due date, but he did pay the taxes that were due and had the funds to pay them at all times. No one accuses respondent of attempting to evade or avoid the payment of his taxes. Rather, he was negligent and careless, giving unreasonable answers to explain the late filings.

Respondent's untruthfulness in answering the questions on the client security form and a possible lack of candor in explaining his tax problems are more serious matters. I do have some sympathy for respondent's answering the questions on the form. He is required to file the client security form, and if he answers other than yes on the tax questions, he is going to be investigated. After fifty-two suspensions, I am certain that he knew what the outcome would be. This provides a strong temptation to lie. While this does not excuse his untruthfulness, it places his conduct in perspective. I believe we must determine how seriously this act affects his ability to serve the public as a lawyer.

When we look at respondent's fitness to practice law from the perspective of his practice, it is clear that he was serving his clients well. He has an unusually high income which suggests that he has devoted time to his practice and that his clients are satisfied with his legal services. He has contributed to his community and taught at his law school. But for his untimely tax filings and his dishonest answers, the record indicates a lawyer extremely fit to practice his profession.

We know that lawyers are prosecuted for traffic offenses, drunk driving and possession of controlled substances. These matters seldom proceed to disciplinary hearings. I fail to see where respondent's conduct is more reprehensible than these other offenses. If his filing difficulties do not involve the evasion or avoidance of his tax liability and do not affect his ability to handle his legal business, I seriously question whether this affects his fitness to practice law to the point where we should suspend his license. While respondent was untruthful concerning his personal tax returns, he did not deceive anyone while conducting legal business. There is no suggestion in this record that respondent is not completely trustworthy in the conduct of his law practice. While I do not approve of respondent's dishonesty, especially in his answers to an official committee of this court, I am more concerned about lawyers who are untruthful while representing clients or otherwise handling legal business.

Other sanctions or conditions placed on his continued right to practice law would be more appropriate. A six-month suspension for this type of misconduct makes sense only if we conclude that the public is at risk from the errant lawyer. This is not the case here. The wrong committed by respondent did not endanger his clients. They, too, will suffer along with respondent, his law firm and his family by the imposition of a long suspension.

We also should consider the effect that a suspension will cause on the individual lawyer in determining the merit of the sanction. A self-employed lawyer is not salaried and cannot turn his income on and off like a water spigot. It takes ability, time and effort to produce a steady income in a law practice. The requirement that a lawyer dispose of all of his files and cases and turn his clients over to someone else negates the previous time and effort required to build a practice. It often takes months or years to return to a presuspension in-

twenty-nine cases, only three had a criminal component.

come. I would speculate that a six-month suspension will cost a nonsalaried lawyer much more than his yearly income. A six-month suspension is a financially devastating sanction.

In summary, I cannot agree that the imposition of a six-month suspension is in line with the reasoning behind the imposition of the penalty. We are merely following a long line of cases without stopping to consider the individual respondent's conduct to determine whether the sanction is required. We should fashion a lesser and more innovative sanction that would protect the public while serving as a deterrent to lawyers as well as not devastating the respondent financially.

