**COMMITTEE ON PROFESSIONAL ETHICS AND CONDUCT OF THE IOWA STATE BAR ASSOCIATION, Appellant,**

v.

**James W. HALL, Appellee.**

**No. 90–1059.**

Supreme Court of Iowa.

Nov. 21, 1990.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for appellant.

James W. Hall, Cedar Rapids, pro se.

Considered by McGIVERIN, C.J., and SCHULTZ, LAVORATO, SNELL and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

■ In this attorney discipline proceeding involving respondent attorney James W. Hall, we review the Grievance Commission's findings, conclusions and recommendation pursuant to Iowa Supreme Court Rule 118.11. Our review is de novo. *See* Iowa Sup.Ct.R. 118.11.

The Grievance Commission found that respondent violated numerous disciplinary rules. The violations stem from a $350,000 loan respondent received from the Citizens State Bank, Hopkinton, Iowa, allegedly through dishonesty, and numerous business ventures with a client, Walter Ronk.

The commission recommended a four month suspension of Hall's license to practice law.

Complainant, Committee on Professional Ethics and Conduct, filed an application for permission to appeal the commission's recommendation pursuant to court rule 118.11. We granted the application. Based upon the record made before the Grievance Commission, we revoke respondent's license to practice law in the courts of this state.

I. *Motion to dismiss.* As a preliminary matter, respondent asserts that we should not reach the merits of this case on appeal because the Grievance Commission erred when it failed to grant respondent's motion to dismiss. Hall urges defenses of res judicata, estoppel, laches and deprivation of due process. The commission found no merit in these contentions and neither do we. Accordingly, we overrule Hall's motion to dismiss urged before us.

II. *Facts.* Hall is an attorney licensed to practice law in this state. His office is in Cedar Rapids. In addition to his law practice, respondent also became involved in several business ventures in the late 1970's and early 1980's. Respondent's conduct in these business ventures has led to the allegations of both complaints, which were consolidated by the Grievance Commission, in this proceeding.

■ The committee bears the burden of proving the allegations of the complaints by a convincing preponderance of the evidence. *Committee on Professional Ethics & Conduct v. Davison*, 414 N.W.2d 97, 98 (Iowa 1987). By that standard, the record shows the following facts.

■ A. *Commission docket no. 252.* On May 14, 1982, Citizens State Bank loaned respondent, president of Lux Pullets, Inc., $350,000 in the form of two promissory notes in the amounts of $200,000 and $150,000. Respondent signed the notes. Respondent falsely represented to the bank that the loans would be used to purchase 60,000 laying hens and equipment for the hen operation of Lux Pullets, Inc. In fact, the notes provided on their face that they were purchase money loans and would be used to purchase hens and equipment.

The note in the amount of $150,000 states that the purpose of the credit is to "purchase 60M laying hens." The note also granted the lender a security interest under the Uniform Commercial Code (UCC), Iowa Code chapter 554, in the 60,000 laying hens. Finally, the note provided that the loan was to be repaid "from proceeds of eggs from approximately 60,000 laying hens...."

The note in the amount of $200,000 states that the purpose of the credit was to "purchase Big Dutchman poultry equipment." The note also granted the lender a security interest under the UCC in the "Big Dutchman equipment sufficient for housing approximately 60M laying hens."

Respondent signed UCC financing statements acknowledging Citizen State Bank's security interest in the laying hens and the Big Dutchman equipment sufficient to house approximately 60,000 laying hens. Citizens State Bank filed these financing statements with the Iowa Secretary of State.

The equipment and laying hens were never acquired by respondent or his company and, thus, the bank received no collateral or security for the loans. The $350,000 was used by respondent for other purposes, and most of the money was never repaid to the bank by respondent or his company. The bank sustained a loss of more than $300,000 on the two notes.

Respondent admits that the loans were not used to purchase hens and equipment to house the hens. However, respondent claims that there was no misrepresentation because the bank was never told that the $350,000 would be used to purchase hens and equipment to house the hens. The evidence clearly supports the contrary conclusion as found by the Grievance Commission.

The notes and security instruments alone establish that the parties viewed the loans as purchase money transactions to be secured by hens and equipment purchased with the loan proceeds. This view is also supported by the testimony of a vice-presi-

dent and the chairman of the board of Citizens State Bank. Any evidence that a contrary agreement was intended was not persuasive to the commission nor to us.

In connection with this transaction, the Grievance Commission concluded that respondent's conduct violated DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), DR 1–102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpitude), DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1–102(A)(6) (lawyer shall not engage in conduct that adversely reflects on fitness to practice law), and EC 1–5 (lawyer should refrain from all illegal and morally reprehensible conduct). We agree.

The Grievance Commission also concluded, and we agree, that respondent made later false statements regarding the May 14, 1982, transaction with Citizens State Bank. The first of these statements occurred when respondent testified in a sworn deposition in a related civil lawsuit that the $350,000 in loans from Citizens State Bank were unsecured loans. The second false statement was a written response to a committee inquiry in which respondent stated that the bank knew that the money loaned on May 14, 1982, would not be used to purchase hens and equipment for Lux Pullets, Inc.

The commission found, and we agree, that the untruthful deposition testimony that the loans were unsecured violated DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), DR 1–102(A)(3) (lawyer shall not engage in illegal conduct involving moral turpitude), DR 1–102(A)(4) (lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1–102(A)(5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice), DR 1–102(A)(6) (lawyer shall not engage in conduct that adversely reflects on his fitness to practice law), and EC 1–5 (lawyer should refrain from all illegal and morally reprehensible conduct).

Hall's false statement to the committee violated DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), DR 1–102(A)(4)

(lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1–102(A)(5) (lawyer shall not engage in conduct that is prejudicial to the administration of justice), DR 1–102(A)(6) (lawyer shall not engage in conduct that adversely reflects on his fitness to practice law), EC 1–4 (duty to assist committees having responsibility for disciplinary rules), and EC 1–5 (lawyer should refrain from all illegal and morally reprehensible conduct).

B. *Commission docket no. 262.* The allegations of this complaint arise from respondent's business ventures with his client, Walter Ronk, over a period of approximately four years.

Ronk had been a client of respondent's law firm for several years and at various times prior to 1978 respondent had acted as Ronk's legal counsel. Beginning in 1978, respondent and Ronk entered into several joint business ventures. During all of their joint business dealings, Ronk regarded respondent as his attorney and looked to him for advice. Some of the business ventures will be recounted below to demonstrate their nature.

In 1978, Ronk and respondent entered into a joint investment in a Louisiana business that purchased and operated oil rig supply boats. To finance their investment, Ronk and respondent jointly borrowed sums totaling in excess of $200,000 from Texas Commerce Bank of Houston, Texas, and Merchants National Bank of Cedar Rapids. Prior to the agreement between the parties, respondent never advised Ronk that his personal involvement in the joint venture might affect his professional judgment on Ronk's behalf, and, prior to the agreement, respondent also never advised Ronk that he should seek independent legal counsel with respect to the venture.

A later venture, entered into in 1979, was an agreement between respondent, Ronk, and Pfeiler (also a client of respondent) to purchase an apartment complex in Florida and convert it into condominiums. The three men jointly borrowed $200,000 from First Bank and Trust Company of Boca Raton, Florida to purchase the complex. Later, respondent and Ronk jointly exe-

cuted two notes in the sum of $290,000 payable to Merchants National Bank of Cedar Rapids, for loans relating to the Florida complex. At no time did respondent advise Ronk that his professional relationship with Pfeiler, or his personal interests in the transaction, might affect his professional judgment on Ronk's behalf. Nor, prior to the agreement, did Hall advise Ronk that he should seek independent legal counsel with respect to the venture.

Another example of respondent's business ventures with Ronk occurred when a partnership, consisting of respondent, Pfeiler and others, agreed to purchase a warehouse in Cedar Rapids. In need of short term financing to finalize the deal, Pfeiler suggested that respondent ask Ronk to co-sign a note with Pfeiler at United States Bank in Cedar Rapids. Respondent presented this proposition to Ronk and he agreed to co-sign the note in the amount of $195,000. At no time did respondent advise Ronk that his professional relationship with Pfeiler, or his personal interests in the transaction, might affect his professional judgment on Ronk's behalf. Nor, prior to the agreement, did Hall advise Ronk that he should seek independent legal counsel with respect to the venture.

A final example of the dealings between Ronk and respondent occurred in March 1981. Respondent was in severe financial difficulty. He owed Merchants National Bank $200,000 and was in default on a loan issued by the Dyersville National Bank in the amount of $81,500.

To obtain the funds to satisfy the debts, respondent contacted Ronk. Respondent indicated to Ronk that the situation regarding the debts was urgent. Respondent advised Ronk that he should co-sign a note to pay off the $200,000 he owed Merchants National Bank, and, in exchange for certain assets owned by respondent, respondent also advised Ronk to pay him the sum of $81,500 so that he could pay the debt owed to Dyersville National Bank. Respondent authored an agreement accomplishing the two transactions set forth above. Included in the agreement was a provision that released respondent and his law firm from any and all claims that Ronk might pursue against respondent or his law firm in the future. Respondent indicated to Ronk that if he did not assist respondent with his financial problems, he would be put into bankruptcy to Ronk's detriment. Ronk signed the agreement.

Ronk departed from respondent's office and proceeded to Merchants National Bank to execute the $200,000 note. When Ronk returned from Merchants National Bank, respondent instructed Ronk to consult attorney Bogguss. Ronk regarded his meeting with Bogguss as a formality in that he had already received legal advice from respondent, and the transaction with respondent was complete. Ronk was essentially correct. Prior to the agreement between respondent and Ronk, respondent never advised Ronk that his personal involvement in the joint venture might affect his professional judgment on Ronk's behalf, nor did Hall advise Ronk that he should seek independent legal counsel with respect to the venture.

Ronk's business dealings with respondent were costly. Respondent and Ronk were jointly liable on notes at Merchants National Bank in Cedar Rapids in total principal amount exceeding $900,000. Due to respondent's financial problems, Ronk was forced to pay most of the money owed on this debt. Even the law firm, of which respondent was a partner when his business transactions with client Ronk occurred, was forced to contribute $45,000 to the settlement with the bank.

Respondent admits that his actions concerning the Ronk matters violated the following provisions of the Iowa Code of Professional Responsibility: DR 1–102(A)(1) (lawyer shall not violate a disciplinary rule), DR 1–102(A)(6) (lawyer shall not engage in conduct that adversely reflects on fitness to practice law), DR 5–101(A) (professional judgment on behalf of client should not be affected by lawyer's own personal interests), DR 5–104(A) (lawyer shall not enter into a business transaction with client without full disclosure of differing interests), DR 5–105(C) (lawyer shall not continue multiple employment where

professional judgment in behalf of one client is adversely affected by representation of another client), DR 6–102(A) (lawyer shall not attempt to be exonerated from or limit liability to client for malpractice), EC 5–1 (lawyer's personal interests or interests of other clients should not be permitted to affect lawyer's professional judgment), EC 5–2 (lawyer should refrain from acquiring a property right or assuming a position that would tend to make judgment less protective of client's interests), EC 5–3 (lawyer should not make improper use of professional relationship to influence client to invest in an enterprise in which the lawyer is interested), EC 5–14 (lawyer should not represent clients with differing interests), EC 6–1 (lawyer should act with proper care in representing clients), EC 6–6 (lawyer shall not seek to limit liability to a client for malpractice), and EC 9–6 (lawyer has a duty to uphold the integrity and honor of legal profession).

■ III. *Appropriate discipline.* Upon our de novo review, we give respectful consideration to the recommendation of the Grievance Committee, but we are not bound by it. *Committee on Professional Ethics & Conduct v. Seff,* 457 N.W.2d 924, 925 (Iowa 1990). We may impose a lesser or greater sanction than the discipline recommended by the commission. *Committee on Professional Ethics & Conduct v. Davison,* 414 N.W.2d 97, 100 (Iowa 1987).

■ A. *Commission docket no. 252.* Initially, we note that the committee need not prove respondent was acting as a lawyer at the time of the alleged misconduct; lawyers do not shed their professional responsibility in their personal lives. *Committee on Professional Ethics & Conduct v. Shuminsky,* 359 N.W.2d 442, 445 (Iowa 1984). It is also immaterial that respondent was not charged or convicted of a crime. A criminal conviction is not a condition precedent to a discipline proceeding when the facts themselves warrant discipline. *Committee on Professional Ethics & Conduct v. Pappas,* 313 N.W.2d 532, 534 (Iowa 1981).

Iowa Code 714.1(3) (1989) provides that a person commits theft when the person ob-

tains possession or control of the property of another, or the beneficial use of property of another, by deception. Respondent took possession of $350,000 from Citizens State Bank by deceiving the bank with a representation that the loan proceeds would be used to purchase hens and equipment, and that the bank would have a security interest in the hens and equipment. These actions constitute a violation of DR 1–102(A)(1), (3), (4) & (6).

When we have been faced with similar situations we have imposed enhanced sanctions. *See, e.g., Committee on Professional Ethics & Conduct v. Austin,* 427 N.W.2d 465 (Iowa 1988) (attorney disbarred for using deception to receive a loan of $55,000 from a bank); *Committee on Professional Ethics & Conduct v. Cody,* 412 N.W.2d 637 (Iowa 1987) (two bad checks, worth less than $1300, written by attorney justified suspension of two and one-half years).

Respondent's actions were further compounded when he later gave false testimony in a sworn deposition regarding the incident, and also when he made false representations to the Committee on Professional Ethics and Conduct. These actions alone constitute serious ethical misconduct. *See, e.g., Committee on Professional Ethics & Conduct v. Baudino,* 452 N.W.2d 455, 458 (Iowa 1990) (false statements on a client security questionnaire will result in disciplinary action); *Committee on Professional Ethics & Conduct v. Crary,* 245 N.W.2d 298, 307 (Iowa 1976) (lawyer should not participate in perjury).

We must also consider the allegations of docket no. 262 in assessing sanctions.

B. *Commission docket no. 262.* Respondent has admitted that he violated several ethical canons in his dealings with Ronk. Most of these violations were the result of respondent's entering into business transactions with a client who had differing interests from that of the respondent, without informing the client that he should obtain independent legal counsel and without receiving consent from the client after full disclosure. Sanctions for violation of this principle have ranged from

public reprimand to revocation of license to practice law, depending on the severity of the violations. *See, e.g., Committee on Professional Ethics & Conduct v. Mershon*, 316 N.W.2d 895 (Iowa 1982) (public reprimand); *Committee on Professional Ethics & Conduct v. Oehler*, 350 N.W.2d 195 (Iowa 1984) (license revocation); *Cf. Committee on Professional Ethics & Conduct v. Yates*, 420 N.W.2d 455 (Iowa 1988) (license revocation).

Respondent's ethical violations in his dealings with Ronk were severe. Respondent did not enter into a one time transaction with Ronk but, rather, a series of transactions occurring over a four year period. These business transactions were largely failures which ended up costing Ronk several hundred thousand dollars. Some of the transactions were solely for the benefit of respondent. Finally, an additional factor with regard to respondent's dealings with Ronk is that respondent attempted to exonerate himself from any professional responsibility for his actions. This alone is a serious ethical violation. *See* DR 6–102(A). The sanction in this case should reflect the seriousness of the violations.

■ C. *Additional factors.* The Grievance Commission believed there were two mitigating factors. First, the commission viewed the long delay between the date of the events and the filing of the complaints as a mitigating factor. We do not agree. *See generally Committee on Professional Ethics & Conduct v. Wunschel*, 461 N.W.2d 840 (Iowa 1990) (lawyer was not sanctioned until 1990 although his unethical conduct occurred in 1980); *Committee on Professional Ethics & Conduct v. Bauerle*, 460 N.W.2d 452 (Iowa 1990) (lawyer was not sanctioned until 1990 although his unethical conduct occurred in 1981 and 1982). The passage of time is never, alone, a mitigating factor. Time is only a mitigating factor when it is accompanied by evidence of changes that reflect on a lawyer's current fitness to practice law. We see nothing that has occurred during the delay in the filing of charges that mitigates the severity of respondent's actions.

■ The commission also viewed the fact that the injured parties were not the complainants as a mitigating factor. We do not believe this situation mitigates the severity of respondent's conduct. *See In re Boyer*, 231 Iowa 597, 600, 1 N.W.2d 707, 709 (1942).

In fact, we conclude there are aggravating factors that suggest a more severe punishment should be imposed than as recommended by the commission. First, respondent has been reprimanded by the Ethics Committee in 1987 in connection with a separate business transaction with a separate client. Second, the number and variety of respondent's ethical violations support an enhanced sanction. Finally, although respondent has admitted that he was involved in a conflict of interest with regard to the Ronk matters, his true belief, as evidenced by his brief, is that he really did nothing wrong. We find it unconvincing that after all of respondent's ethical improprieties, he does not believe he has committed anything more than technical violations. We see little indication that respondent understands his wrongdoing.

D. *Disposition.* Based upon our de novo review of the record made before the commission, we revoke Hall's license to practice law in Iowa. *See* Iowa Sup.Ct.R. 118.10.

Costs are taxed to Hall pursuant to Iowa Supreme Court Rule 118.22.

LICENSE REVOKED.