# IN THE SUPREME COURT OF IOWA

No. 14–1201

Filed March 27, 2015

Amended June 5, 2015

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**ANTHONY ZANE BLESSUM,**

Respondent.

_____

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Respondent appeals from the grievance commission's findings of ethical violations and its recommendation of a four-year suspension. **LICENSE SUSPENDED.**

Charles L. Harrington and Elizabeth E. Quinlan, Des Moines, for complainant.

David L. Brown, Hansen, McClintock & Riley, Des Moines, Brenda K. Wallrichs, Lederer Weston Craig PLC, Cedar Rapids, and Kent A. Gummert, Lederer Weston Craig PLC, West Des Moines, for respondent.

**MANSFIELD, Justice.**

An Iowa attorney entered into an intimate relationship with one of his clients, then assaulted her after the relationship deteriorated. The attorney pled guilty to assault causing bodily injury, a serious misdemeanor. *See* Iowa Code §§ 708.1(1), .2(2) (2011). In addition, the attorney did not finalize the qualified domestic relations order (QDRO) in this client's divorce case for two years, and he withdrew this client's fee from his trust account before doing the work.

The Board filed a complaint alleging the attorney violated Iowa Rules of Professional Conduct 32:1.3 (lack of diligence), 32:1.8(j) (sexual relationship with a client), 32:8.4(b) (criminal act adversely reflecting on the attorney's fitness as a lawyer), and 32:1.15(c) (improper handling of client funds). A grievance commission panel found that these alleged violations had occurred and recommended the attorney be suspended indefinitely with no possibility of reinstatement for four years. The attorney has appealed from the commission's recommendation.

Based on our de novo review of the matter, including the aggravating and mitigating circumstances and our relevant precedents, we conclude the attorney violated rules 32:1.8(j), 32:8.4(b), and 32:1.15(c). We order that his license be suspended indefinitely with no possibility of reinstatement for eighteen months.

## I.  Background Facts and Proceedings.

Anthony Zane Blessum was admitted to the Iowa bar in 1984. For eleven years beginning in 1986, Blessum served part time as the Madison County Attorney. He currently practices in West Des Moines as a solo practitioner. He handles criminal law, family law, personal injury, breach of contract, workers' compensation, and social security cases.

In October 2008, Jane Doe[1] and her husband came to Blessum's office seeking legal assistance to dissolve their marriage. Blessum had previously represented Doe's husband in one matter in 2002 and had written a letter on behalf of Jane Doe in a real estate matter in 2007. Blessum informed the couple he could not represent both of them because it would be a conflict of interest. It was decided that Blessum would represent Jane Doe only and would draft the petition for dissolution of marriage.

Doe paid Blessum a $1000 fee on October 6, 2008, for his representation in the divorce. Blessum deposited the $1000 into his trust account on October 6 but then withdrew the entire amount on October 14. He did not notify Doe of the withdrawal.

Blessum filed the petition on behalf of Jane Doe later that month. In February 2009, Blessum drafted a proposed divorce decree and sent copies to Doe and her husband. The stipulated decree of dissolution was filed and approved by the district court in March. It provided, in relevant part, that Jane Doe was to be awarded $110,000.00 from her husband's retirement plan and that "[Jane Doe]'s attorney shall be responsible for preparing the necessary documents to effectuate this transfer."

At that time, Blessum sent a copy of the decree and a letter to Doe, stating, "Our office will prepare the Qualified Domestic Relations Order [QDRO—to effectuate the transfer from your ex-husband's retirement plan] once we receive the pension documents from [your ex-husband]." That same day, Blessum wrote Doe's ex-husband asking him to forward his pension documents. Doe's ex-husband provided the relevant documents to Blessum two months later. Handwritten notes in

---

[1]Due to the sensitive nature of the complaint and the underlying facts, we use the pseudonym "Jane Doe" to refer to the complainant.

Blessum's file indicate he mailed drafts of the QDRO to both parties for their approval but received no response. Undated, handwritten notes in the file also indicate that Doe later called Blessum's office and asked him to stop work on her case.

On December 21, Blessum's legal assistant mailed copies of the QDRO to Jane Doe, Doe's ex-husband, and the pension provider of Doe's ex-husband as part of the Blessum office's end-of-the-year procedure to tie up loose ends. Yet on December 31, Blessum sent Doe a further letter that stated in part,

> Recently my office sent out to you, [your ex-husband] and the Administrator [of his pension plan], a proposed Qualified Domestic Relations Order (QDRO) that we were to prepare according to the stipulated decree. This was done.
>
> Previously you had called and said to hold off on the QDRO. Again, we have not heard back from you. We will . . . close out this file.
>
> This concludes our work for you.
>
> Sincerely,
>
> A. Zane Blessum

Meanwhile, the pension administrator for the ex-husband's plan wrote Blessum on February 3, 2010, signaling its approval of the proposed QDRO. And on February 12, Blessum received a faxed letter from Jane Doe's ex-husband himself. The letter read,

> Dear Zane,
>
> In regards to our QDRO we agree to the following changes to your draft submitted to [ex-husband's pension provider] dated December 21, 2009.
>
> Item #4: The Alternate Payee's [(Jane Doe's)] accounts effective date shall begin as of August 1, 2008.
>
> Item # 7 [Line struck through].
>
> Thank you for your attention in this matter.

(Signed)

[Doe's ex-husband]                    [Jane Doe][2]

Both Jane Doe and her ex-husband had signed the letter at the bottom and initialed the line that had been struck through. The fax cover sheet from Doe's ex-husband contained an additional handwritten note that explained, "We crossed off #7 so the only change will be to the date the money is split. I'm mailing you an original. Any questions please call." Blessum did not take any additional action on the QDRO at the time.

Blessum had no further correspondence with Jane Doe until March 22, 2011. On that day, Doe came to Blessum's office seeking assistance in preparing her will. During that meeting, Doe and Blessum also discussed finalizing the QDRO. Within the next few weeks, Doe and Blessum began an intimate relationship. Blessum completed Doe's will on June 28 and the QDRO was filed on August 23.

Blessum and Doe's intimate relationship lasted for some time. By early June 2012, though, they were experiencing problems. Doe was concerned that Blessum had been with another woman at a concert on the evening of June 8. Doe and Blessum discussed Doe's concerns via text message on June 9 and 10. On June 10, Doe suffered an anxiety attack and was admitted to the emergency room. She was prescribed medication and released the same day. On June 11, Doe came to Blessum's house to talk about her concerns that he was involved with

---

[2]Jane Doe claims her ex-husband forced her to sign this letter. Had the effective date of the division of the retirement account been successfully moved back to August 1, 2008, as provided in the letter, Doe's ex-husband presumably would have received a financial benefit (and Jane Doe would have suffered a detriment). That is because stock prices dropped significantly between August 1 and the date of their divorce. In any event, this proposed change in effective date was not reflected in the final version of the QDRO.

other women. The discussion became heated. Doe was angry Blessum appeared to be fixing a romantic dinner for someone else and she picked up and threw the cooking pan he had been using.

During the argument, Doe became quite upset and attempted to take one of the anxiety pills that had been prescribed to her the day before. Before Doe could take the pill, Blessum struck her in the face, causing her to drop the pills. Blessum hit her more than once. Doe grabbed some of the pills that had fallen onto the floor and swallowed them after Blessum struck her. Blessum refused to let Doe leave his house and physically restrained her to prevent her from leaving.

Doe managed to call 911 when Blessum left the room to get a glass of water to try to make her throw up the pills. When Blessum returned, Doe hid the phone under a stack of papers. Both of them were unaware the call had gone through and was being monitored and recorded. Blessum continued to assault Doe and restrain her from leaving. He made crude threats to her as she begged to be let go. Meanwhile, the 911 dispatcher sent police to Blessum's house and continued to monitor the call until they had arrived. When the police knocked on Blessum's door, Doe cried out for help.

Doe suffered lacerations to her mouth, a black eye, a torn piercing, swelling on her eye, cheek, and mouth, and bruises to her arm, abdomen, face, and neck. She was taken away by an ambulance and treated at an emergency room for her injuries.

After the assault, Blessum contacted Doe repeatedly to apologize. In a note, he said, "I am sorry for hitting you and terrorizing you." Doe initially agreed to get back together with Blessum. Blessum also instructed Doe to call the Dallas County courthouse and tell the authorities she did not want to press charges. However, when the two of

them broke up for good in August, Doe made further contact with the police and obtained a no-contact order from the court.

Blessum was eventually charged in January 2013. He pled guilty to assault causing bodily injury in violation of Iowa Code sections 708.1(1) and 708.2(2), a serious misdemeanor. He was sentenced to one year in jail with all but seven days suspended, ordered to pay a $315 fine and $6,988.68 in restitution, and placed on probation for twelve months. As part of his probation, Blessum was required to complete anger management counseling.

Doe lodged two disciplinary complaints with the Board concerning Blessum. The Board investigated and filed its complaint against Blessum in August. The complaint detailed Blessum's handling of the QDRO and his subsequent relationship with Doe, including the assault charge. It alleged Blessum had violated Iowa Rules of Professional Conduct 32:1.3 (lawyer shall act with reasonable diligence), 32:8.4(d) (conduct prejudicial to the administration of justice),[3] 32:1.8(j) (sexual relations with a client), and 32:8.4(b) (criminal act reflecting on lawyer's honesty, trustworthiness, or fitness).

On April 1, 2014, the Board amended its complaint to add a count relating to the advance fee Doe had paid Blessum to handle the dissolution. The Board alleged Blessum had withdrawn the $1000 fee before it was earned and did not provide Doe with a contemporaneous accounting. The Board asserted this conduct violated Iowa Rule of Professional Conduct 32:1.15(c) (lawyer shall withdraw fees as earned) and several of the rules governing trust accounts, including Iowa Court Rules 45.7(3) (lawyer may withdraw fee only as earned), 45.7(4) (lawyer

---

[3]The Board subsequently withdrew its allegation that Blessum's conduct was prejudicial to the administration of justice.

must notify client of withdrawal), 45.10(1) (describing a flat fee), 45.10(2) (advance payment of a flat fee must be deposited into a trust account), and 45.10(3) (lawyer and client can agree on how fees are withdrawn).

Blessum filed his answer to the amended complaint on April 10, 2014. He admitted the factual allegations underlying his relationship with Doe and the assault, but denied that they amounted to ethical violations. He admitted that he had improperly withdrawn the fee and that this was a trust account violation.

Blessum designated two expert witnesses to testify on his behalf, Timothy G. Pearson and Mark McCormick, both of whom are attorneys in the Des Moines area. In support of his designations, Blessum provided an expert opinion letter from each of them.

Pearson's letter was a little over one typewritten page in length. In it, Pearson stated he had reviewed Blessum's file on Doe's dissolution of marriage case and that, in his opinion, Blessum acted diligently in the matter. He noted that it was not unusual for a considerable amount of time to pass in the filing of QDROs, that Doe's ex-husband was unrepresented and pro se litigants frequently cause delays, and that Doe herself had asked Blessum to stop work on the QDRO.

McCormick's letter was also about a page long. McCormick accurately stated that the caselaw of this court requires a nexus between an attorney's criminal act and his or her fitness to practice law in order to impose discipline. McCormick offered the opinion that there was no nexus in Blessum's case because the assault was a one-time occurrence and out of Blessum's character. His letter concluded,

> The facts I reviewed do not show any link between the conduct and Mr. Blessum's ability to carry out his professional responsibilities.

> As I understand the facts, the Board under the applicable standard could well find no reasonable likelihood of a recurrence of the conduct and that the act received ample redress in the criminal court.

The Board moved to exclude both experts, arguing their testimony would be inadmissible since they would be opining on the applicable legal standards in the case. Blessum resisted the Board's motion. He maintained that Pearson was an expert in family law who could provide enlightenment on the typical handling and processing of QDROs, such as the one involved in Doe's case. Blessum argued that McCormick, a former Iowa Supreme Court Justice who represents attorneys in proceedings before the disciplinary commission, would be able to offer expert insight into the nexus required between Blessum's criminal conduct and his fitness to practice law. Blessum disputed that these experts would be offering their opinions on purely legal standards. The commission, however, agreed with the Board and granted its motion to preclude the expert witnesses from testifying.

A two-day hearing took place before the grievance commission on April 10 and 11. Both Doe and Blessum testified. Blessum admitted the trust account violation, and admitted he had struck Doe several times on June 11, 2012, but denied that Doe was his client when their sexual relationship began or that he had been guilty of neglect with respect to the QDRO.

The commission issued its findings of fact, conclusions of law, and recommended sanction on July 24, 2014. It concluded that Blessum had committed all the ethical violations alleged by the Board. Among other things, the commission determined that Blessum should have continued to work on the QDRO after receiving the fax from his client's ex-husband and his failure to do so constituted a lack of diligence. With

respect to Blessum's sexual relationship with Doe, the commission found that Blessum was still Doe's attorney on the QDRO matter when their relationship began. The commission also decided Blessum's conviction for assault reflected adversely on his fitness as a lawyer. The commission discredited Blessum's version of the events of June 11, 2012, namely, that he was just trying to defuse the situation and prevent Doe from committing suicide, and that he rather than Doe had called 911. Finally, the commission found Blessum's handling of the $1000 advance fee constituted a violation of the trust account rules.

The commission noted as a mitigating factor that Blessum was in counseling but also found several aggravating factors. Specifically, the commission determined Blessum had minimized his responsibility and tried to shift the blame to Doe throughout the proceedings. The commission also noted Blessum had nearly thirty years of experience as an attorney and had committed multiple infractions against the same client. The commission ultimately recommended an indefinite suspension with no possibility of reinstatement for four years.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. Iowa Ct. R. 35.12(4); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mendez*, 855 N.W.2d 156, 165 (Iowa 2014). The Board has the burden to prove attorney misconduct by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Barnhill*, 847 N.W.2d 466, 470 (Iowa 2014). "This standard is more demanding than proof by preponderance of the evidence, but less demanding than proof beyond a reasonable doubt." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk,* 845 N.W.2d 31, 33 (Iowa 2014).

We give weight to the findings of the commission, especially with regard to the credibility of witnesses, but we are not bound by the commission's determinations. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kieffer–Garrison*, 847 N.W.2d 489, 492 (Iowa 2014). Notwithstanding our de novo review of the facts, we review the commission's evidentiary rulings for an abuse of discretion. *See In re A.K.*, 825 N.W.2d 46, 49 (Iowa 2013); *In re N.N.E.*, 752 N.W.2d 1, 6 (Iowa 2008).

**III. Admissibility of Expert Witness Testimony.**

Blessum argues the commission erroneously excluded the anticipated testimony of his expert witnesses, attorneys McCormick and Pearson. He urges us to accept and consider McCormick's and Pearson's opinions in our de novo review of this matter.

Our prior caselaw has addressed when expert testimony is admissible to assist the trier of fact.[4] In *Grismore v. Consolidated Products Co.*, we indicated an expert could testify regarding cause and effect in areas of specialized knowledge such as scientific, mechanical, or professional areas of study. 232 Iowa 328, 343, 5 N.W.2d 646, 655 (1942). We stated this was true even if the expert opinion touched upon a so-called "ultimate fact" in the case. *See id.* at 343–44, 5 N.W.2d at 655. Thus, in *Grismore*, we upheld the trial court's admission of expert testimony on what had caused the sickness and death of the plaintiff's turkeys, even though causation was an ultimate issue in the case. *Id.* at 340–41, 361, 5 N.W.2d at 654, 663.

More recently, we clarified that while *Grismore* abolished the blanket rule prohibiting experts from testifying on ultimate issues, there remain limits on the admissibility of expert testimony. *See In re Det. of*

---

[4]The Iowa Rules of Evidence apply in grievance commission hearings. *See* Iowa Ct. R. 36.14(4).

*Palmer*, 691 N.W.2d 413, 418 (Iowa 2005) (citing *Grismore*, 232 Iowa at 343, 361, 5 N.W.2d at 655, 663). An expert witness "cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard." *Id.* at 419. Opinions couched in legal terms are problematic because they may lead the jury to misunderstand the law. *See id.* Therefore, "[w]hether an opinion couched in legal terms is excludable . . . depends on 'whether the terms . . . have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' " *Id.* at 420 (quoting *Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985)). Such specialized legal terms are not properly the subject of expert opinion testimony. *See id.*

Our court went on to apply this rule to the facts of that case. In *Palmer*, the expert was permitted to give her opinion on "whether the respondent's pedophilia makes it likely that he will engage in predatory acts of a sexually-violent nature" if he were not civilly committed. *Id.* at 420 (internal quotation marks omitted). The language "likely to engage in predatory acts constituting sexually violent offenses" came directly from the statute under which the state was seeking to commit the respondent. *See id.* (quoting Iowa Code § 229A.2(11) (2003)). Yet, we determined the expert could testify as to whether the defendant was likely to commit an act because the statutory definition of "likely"—more likely than not—mirrored its popular meaning. *Id.* at 421. At the same time, we found the expert should not have been permitted to testify regarding "predatory" and "sexual[ly] violent offenses," however, because these were legal terms with precise definitions that were more specialized than the common vernacular. *See id.*

In a case of sexual exploitation by a counselor, where one of the issues was whether the defendant had counseled the victims within the

meaning of the criminal statute, we upheld a trial court ruling barring an expert from testifying as to whether the pastor defendant's actions amounted to "pastoral counseling." *State v. Edouard*, 854 N.W.2d 421, 426, 436–37 (Iowa 2014). In an offer of proof, the expert testified that the theological community recognized an important difference between pastoral care and pastoral counseling. *Id.* at 436. We concluded that the specialized definition given to these terms within the *theological* community was irrelevant to whether the defendant's actions fell within the *legal* definition of "mental health services." *Id.* at 437.

We have also applied the principles of *Grismore* and *Palmer* to proposed expert testimony in attorney disciplinary proceedings. *See Comm. on Prof'l Ethics & Conduct v. Baudino*, 452 N.W.2d 455, 459 (Iowa 1990) (citing *Grismore*, 232 Iowa at 361, 5 N.W.2d at 663). In *Baudino*, the attorney failed to properly file his state and federal income tax returns. *Id.* at 456. At the hearing before the ethics commission, Baudino called a law professor to testify as an expert witness on his behalf. *Id.* at 459. The professor opined that Baudino should not be subject to a disciplinary sanction because his failure to file taxes was due to confusion, not an intentional disregard of the law. *Id.* We stated the professor's testimony was of "questionable admissibility" because it was an opinion on whether Baudino's conduct met the legal standard warranting a sanction. *See id.* at 459–60. However, we ultimately found it unnecessary to consider the expert's testimony anyway because it was grounded on a factual assumption—the attorney's genuine confusion— that we did not accept. *See id.* at 460.

In light of the foregoing, we believe the commission properly excluded McCormick's testimony. McCormick's letter indicated that he would be testifying on an ultimate issue that was a purely legal one—

namely, whether there was a nexus between Blessum's criminal conduct and the practice of law. It is difficult to see what an expert opinion would add to this analysis. Nexus in this context is a legal term of art, and we have adopted the following multifactor test to resolve the nexus question:

> There must be some rational connection other than the criminality of the act between the conduct and the actor's fitness to practice law. Pertinent considerations include the lawyer's mental state; the extent to which the act demonstrates disrespect for the law or law enforcement; the presence or absence of a victim; the extent of actual or potential injury to a victim; and the presence or absence of a pattern of criminal conduct.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Khowassah*, 837 N.W.2d 649, 653 (Iowa 2013) (internal quotation marks omitted). Factors such as "mental state," "disrespect," the "presence or absence of a victim," the "extent of actual or potential injury to a victim," and the "presence or absence of a pattern of criminal conduct" are simply not ones where the testimony of a legal expert is likely to be helpful. *See id.*; *cf.* Iowa R. Evid. 5.702 (allowing expert testimony that "will assist the trier of fact to understand the evidence or to determine a fact in issue").

Pearson's proposed expert testimony presents a closer call. His letter sets forth the opinions of a domestic-relations attorney on the timeliness of Blessum's work on the QDRO. The Board argues that because Pearson opined on Blessum's "diligence"—the same term used in rule 32:1.3—the commission properly excluded his testimony. However, unlike "sexually violent offense," *Palmer*, 691 N.W.2d at 420–22, or "mental health services," *Edouard*, 854 N.W.2d at 436–37, or even "nexus," *Khowassah*, 837 N.W.2d at 653, the term "diligence" does not have a specialized legal definition. To the contrary, a review of our caselaw indicates "diligence" in the context of an attorney disciplinary

proceeding pursuant to rule 32:1.3 has been given a commonsense meaning. *See, e.g., Barnhill*, 847 N.W.2d at 483 (indicating that this rule requires an attorney to "handle a client matter in a reasonably timely manner"). Whether an attorney acted with proper diligence can be the basis for a malpractice action, and we normally require expert testimony on the standard of care in those cases. *See Crookham v. Riley*, 584 N.W.2d 258, 266 (Iowa 1998). Nonetheless, for the reasons discussed below, we find Blessum did not violate rule 32:1.3. Therefore, even if Pearson should have been permitted to testify on that issue, it did not affect the proceeding.

**IV. Review of Alleged Ethical Violations.**

**A. Failure to Act with Reasonable Diligence (Rule 32:1.3).** Rule 32:1.3 states, "A lawyer shall act with reasonable diligence and promptness in representing a client." Iowa R. Prof'l Conduct 32:1.3. In *Iowa Supreme Court Attorney Disciplinary Board v. Taylor*, we elaborated on when conduct may violate rule 32:1.3:

> Generally, a violation of rule 32:1.3 cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith. An attorney does not typically commit neglect by missing a single deadline. Instead, neglect involves a consistent failure to perform obligations the lawyer has assumed or a conscious disregard for the responsibilities a lawyer owes to a client and may arise when an attorney repeatedly fails to meet deadlines.

814 N.W.2d 259, 265 (Iowa 2012) (citations omitted) (internal quotation marks omitted); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 845 N.W.2d 59, 64 (Iowa 2014); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Van Ginkel*, 809 N.W.2d 96, 102 (Iowa 2012).

In the context of a dissolution-of-marriage case such as Doe's, we have found a violation of rule 32:1.3 when an attorney ceased working on

the divorce, resulting in a default decree being entered against his client. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Hauser*, 782 N.W.2d 147, 150, 152–53 (Iowa 2010). Hauser had initially provided appropriate representation, including the filing of an answer to the dissolution petition on his client's behalf. *Id.* at 150. Within a few months, however, Hauser stopped doing any additional work on the case. *See id.* He did not file any further pleadings or motions and failed to appear for the scheduled trial. *Id.* After the default decree was entered, Hauser's client repeatedly tried to contact him to no avail. *Id.* The client eventually had to pay another attorney who attempted—unsuccessfully—to have the default judgment set aside. *Id.* We characterized Hauser's actions as "severe neglect," "total abandonment," and "clearly harmful to his client." *Id.* at 153.

We also found a lack of diligence in another dissolution case, *Iowa Supreme Court Attorney Disciplinary Board v. Johnson*, 792 N.W.2d 674, 678–81 (Iowa 2010). There, the attorney failed to appear for status conferences and did not respond to his client's or the court's inquiries, resulting in unfavorable court decisions for his client. *Id.* at 679–80.

We have found other instances of persistent neglect to constitute a lack of attorney diligence in violation of rule 32:1.3. *See, e.g., Conroy*, 845 N.W.2d at 64–65, 67 (disciplining an attorney for failing to meet deadlines in six appeals and failing to cure the defaults after being notified of the opportunity to do so); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Humphrey*, 812 N.W.2d 659, 664–65 (Iowa 2012) (finding a violation where the attorney did not respond to repeated client inquiries and the only action the attorney took in an insurance settlement case during a twenty-month period was to send two letters); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cunningham*, 812 N.W.2d 541, 547, 549, 553

(Iowa 2012) (disciplining an attorney who did not pass along discovery requests to a client and failed to notify that client of a hearing and sanctions imposed in one case and never filed a bankruptcy petition he promised to file in another case); *Van Ginkel*, 809 N.W.2d at 100, 102 (finding that seven probate delinquencies in one estate, resulting in the estate being closed two years after the statutory deadline, established neglect); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ochs*, 804 N.W.2d 720, 721–22 (Iowa 2011) (holding attorney violated disciplinary rules when he missed deadlines in ten separate probate cases over a number of years); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 796 N.W.2d 910, 913–14, 917, 919, 922–23 (Iowa 2011) (sanctioning an attorney for allowing two cases to be dismissed and failing to timely close an estate despite repeated delinquency notices).

In the present case, the Board correctly points out that the QDRO was not filed for more than two years after the dissolution decree was entered. However, this fact alone does not establish that Blessum violated the applicable ethical rule. In fact, Blessum initially performed work on the QDRO, including seeking required paperwork from Doe's ex-husband, preparing a draft QDRO, and sending the draft to Doe and her ex-husband. Doe failed to directly respond to correspondence, and at one point, told Blessum's office to stop working on the QDRO.[5] It is true, as the commission found, that a significant period of time elapsed from February 2010, when Doe's ex-husband faxed revised instructions to Blessum regarding the QDRO, and August 2011, when the QDRO was finally filed. But this fact needs to be placed in context. Blessum

---

[5]Doe denies that she gave this instruction. Still, it was reflected in Blessum's notes and later confirmed in Blessum's December 31, 2009 letter, which was sent before any dispute between Doe and Blessum arose. We accept Blessum's version of events here.

initially handled the matter diligently, the client was not responsive, the client told Blessum's office to stop working on the matter, and at the end of 2009, Blessum advised Doe he was closing his file on the QDRO. *Cf. Humphrey*, 812 N.W.2d at 664–65 (disciplining an attorney for sending only two letters in a twenty-month period on behalf of his client); *Johnson*, 792 N.W.2d at 679–80 (imposing a sanction on an attorney who did little to no work on behalf of his client).

We agree with the commission that Blessum should have taken action after receiving the February 2010 letter from Doe's ex-husband that was signed by Doe and requested changes to the QDRO. We do not accept Blessum's argument that his December 31, 2009 letter "clos[ing] out the file," which came just ten days after his office's letter enclosing the draft QDRO and which was not accompanied by any effort to formally withdraw from the case, was enough to terminate his representation of Doe. However, we cannot find that this inactivity by itself establishes a rule violation. Overall, we are unable to conclude that a single instance of nonprejudicial delay in filing a single document, attributable partly to the client, partly to her ex-husband, and partly to the attorney, amounts to a violation of rule 32:1.3. Because we find no rule violation, we need not determine whether the commission abused its discretion in excluding Pearson's anticipated expert testimony, which went only to this issue.

**B. Sexual Relations with a Client (Rule 32:1.8(j)).** "A lawyer shall not have sexual relations with a client, or a representative of a client, unless the person is the spouse of the lawyer or the sexual relationship predates the initiation of the client-lawyer relationship." Iowa R. Prof'l Conduct 32:1.8(j). The sexual relationship need not constitute sexual harassment or involve coercion to violate this rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morrison*, 727 N.W.2d 115,

118–19 (Iowa 2007) (indicating that even purely consensual sexual relationships are prohibited as between client and attorney under similarly worded prior ethical rule); *see also* Iowa R. Prof'l Conduct 32:1.8 cmt. 17 ("[T]his rule prohibits the lawyer from having sexual relations with a client regardless of whether the relationship is consensual and regardless of the absence of prejudice to the client.").

The unequal nature of the relationship between an attorney and his or her client "renders it impossible for the vulnerable layperson to be considered consenting to the sexual relationship." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Marzen*, 779 N.W.2d 757, 760 (Iowa 2010) (internal quotation marks omitted). "[A] sexual relationship between lawyer and client can involve unfair exploitation of the lawyer's fiduciary role, in violation of the lawyer's basic ethical obligation not to use the trust of the client to the client's disadvantage." Iowa R. Prof'l Conduct 32:1.8 cmt. 17. The rule is clear that any sexual relationship with a current client is prohibited, regardless of the circumstances. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Furlong*, 625 N.W.2d 711, 714 (Iowa 2001) (stating while applying rule 32:1.8(j)'s predecessor that "[p]rofessional responsibility involves many gray areas, but sexual relationships between attorney and client is not one of these[ and s]uch conduct is clearly improper").

Some of the more notorious cases under this rule involve so-called "sex for fees" arrangements in which attorneys persuade their clients to have sexual relations with them in exchange for legal services. *See, e.g.*, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bowles*, 794 N.W.2d 1, 4–5 (Iowa 2011) (finding a violation where the attorney had previously had a sexual relationship with the client and the client later engaged in a sex act with the defendant to induce him to represent her on another

matter); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGrath*, 713 N.W.2d 682, 695, 702–03 (Iowa 2006) (finding attorney violated former rule DR 5–101(B) prohibiting attorney–client sexual relationships by proposing that his client "do something nice" for him in exchange for working on a client's visitation case (internal quotation marks omitted)).

However, even sexual relationships between attorney and client that do not involve an exchange for fees violate rule 32:1.8(j) because a client cannot, by definition, consent to a relationship with his or her attorney. Iowa R. Prof'l Conduct 32:1.8 cmt. 17. For example, in *Iowa Supreme Court Attorney Disciplinary Board v. Monroe*, we found a violation of rule 32:1.8(j) when the attorney had a sexual relationship with a client he represented in a child custody dispute. 784 N.W.2d 784, 787–88 (Iowa 2010). The client with whom Monroe had the relationship testified "that she felt it was her own decision to be in or out of the relationship" and there was no coercion or expectation that her fees would be forgiven in exchange for sex. *Id.* at 787. Furthermore, at the hearing, the client stated she "harbor[ed] no ill will toward Monroe and continue[d] to regard him as a good friend." *Id.* We nevertheless concluded the relationship violated the rule. *Id.* at 788; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. Moothart*, 860 N.W.2d 598, 609, 612 (Iowa 2015) (finding violations where the attorney had sexual relations with two different clients); *Marzen*, 779 N.W.2d at 760, 764 (finding a violation where the attorney had sexual relations with a client he represented on hospitalization commitment, custody, and child support issues); *Morrison,* 727 N.W.2d at 117–18 (finding a violation of then-existing disciplinary rules where an attorney had sexual relations with a client he represented in a dissolution proceeding); *Furlong,* 625 N.W.2d at 712–14 (finding a violation under prior rule where the attorney

engaged in a twenty-month, consensual sexual relationship with a client he represented on several different matters).

The rule contains an exception for sexual relationships that predate the attorney's representation of the client. Iowa R. Prof'l Conduct 32:1.8(j). Blessum relies on this exception and maintains that Doe was not his client when their sexual relationship began. According to Blessum, his representation of Doe on the dissolution matter terminated with his December 31, 2009 letter. Blessum insists he was not representing Doe in any legal matter when their sexual relationship commenced in April 2011. Like the commission, we find otherwise.

The existence of an attorney–client relationship is governed by contract principles and may be either express, such as a relationship based on an actual written agreement, or implied from the conduct of the parties. *See Comm. on Prof'l Ethics & Conduct v. Wunschel*, 461 N.W.2d 840, 845 (Iowa 1990). An attorney–client relationship is established when three elements are met:

> (1) a person sought advice or assistance from an attorney, (2) the advice or assistance sought pertained to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agreed to give or actually gave the desired advice or assistance.

*Id.*; *see also* Restatement (Third) of the Law Governing Lawyers § 14, at 125 (2000).

Doe testified that when she met with Blessum on March 22, 2011, it was her understanding that he was "going to do [her] will." Blessum also testified that "[s]he became [his] client that day" because he "agree[d] to do her will for her."[6] These statements indicate (1) Doe "sought . . .

---

[6]Blessum testified that as he was getting more intimate with Doe, but before the parties had engaged in sexual relations, he made a note not to proceed with the will. He then claims he changed course and decided to prepare the will later, *after* their relationship became sexual. We do not find this aspect of his testimony credible. In

assistance from an attorney" (Blessum), (2) the "assistance sought pertained to matters within" Blessum's professional competence (drafting a will), and (3) "the attorney expressly . . . agreed to give . . . the desired . . . assistance" (it was understood Blessum would draft Doe's will). *See Wunschel*, 461 N.W.2d at 845. Their sexual relationship began a few weeks thereafter. Because we conclude that Blessum and Doe established an attorney–client relationship on the will matter on March 22, we need not determine whether Blessum's representation of Doe on the QDRO was still ongoing at that time. Blessum violated rule 32:1.8(j).

**C. Criminal Act Adversely Reflecting on Lawyer's Fitness to Practice Law (Rule 32:8.4(b)).** Rule 32:8.4(b) states it is professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." Iowa R. Prof'l Conduct 32:8.4(b).

This rule requires the criminal act to have a nexus with the lawyer's honesty, trustworthiness, or fitness to practice law. *See id.*; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 767 (Iowa 2010) (stating that under the modern rule, "[t]he mere commission of a criminal act does not necessarily reflect adversely on the fitness of an attorney to practice law"). "There cannot be too much attention focused on the moral quality of the conduct; instead, the court must focus on the link between the conduct and the actor's ability to function as a lawyer." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Schmidt*, 796 N.W.2d 33, 40 (Iowa 2011). Conduct meets the definition of reflecting adversely on an attorney's fitness when it "reveals character defects, which affect[] the lawyer's ability to deal with important

---

any event, a unilateral decision not to draft the will, which was not communicated to Doe, would not suffice to terminate their attorney–client relationship.

controversies and confidential information and that lessen [ ] public confidence in the legal profession." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Keele*, 795 N.W.2d 507, 512 (Iowa 2011) (second alteration in original) (internal quotation marks omitted). As noted above, we consider several factors in determining whether an attorney's criminal act reflects adversely on his or her fitness to practice law. *Id.*; *see also Templeton*, 784 N.W.2d at 767.

In one case, we held a defendant's conviction for domestic abuse assault on his wife reflected adversely on his fitness to practice law because the victim was seriously injured and because the attorney's repeated violations of a no-contact order demonstrated a lack of respect for the law. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Axt*, 791 N.W.2d 98, 101–02 (Iowa 2010).

Similarly, in *Schmidt*, we determined that an attorney's criminal acts of domestic violence reflected adversely on his fitness as a lawyer in violation of rule 32:8.4(b). 796 N.W.2d at 41. In that case, Schmidt and his wife were having an argument at their home when Schmidt threw his wife down, choked her, and chased her around the house. *Id.* at 38. He then choked her two additional times until she lost consciousness. *Id.* The wife ultimately escaped to a neighbor's house and attempted to call 911, but Schmidt stopped her and lied to the neighbor by telling him his wife had fallen and hit her head in the hot tub. *Id.* When a sheriff's deputy finally arrived and placed Schmidt in the patrol car, Schmidt broke through the steel cage in the back seat and used the deputy's cell phone. *Id.* Schmidt's wife was taken to the hospital for treatment. *Id.* Subsequently, she and the children had a number of psychological problems for which they had to undergo counseling. *Id.* at 39. Schmidt

pled guilty to two aggravated misdemeanors involving domestic abuse. *Id.* at 38.

Applying the considerations set forth above from *Keele* and *Templeton*, we noted Schmidt's criminal conduct involved "the conscious decision to act on [his] hostility and assault his wife multiple times, rather than walk away" and his depression did not excuse this choice. *Id.* at 41. Furthermore, Schmidt demonstrated disrespect for law enforcement by preventing his wife from calling 911, lying to the neighbor, and breaking the steel cage in the deputy's patrol car. *Id.* Finally, Schmidt's wife and children were victims of his criminal acts; his wife was harmed physically and mentally, and his children were traumatized by having witnessed the event. *Id.*

In *Iowa Supreme Court Attorney Disciplinary Board v. Cannon*, we considered the case of an attorney who had received convictions for operating a boat while intoxicated, possession of cocaine, and OWI. 821 N.W.2d 873, 877 (Iowa 2012). We found a nexus there as well, emphasizing the actual property damage and threat of physical harm to persons resulting from his conduct, the attorney's pattern of criminal conduct, and his disrespect for the law and law enforcement exemplified by his responses when confronted by law enforcement. *Id.* at 878–80; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Weaver*, 812 N.W.2d 4, 11–12 (Iowa 2012) (finding a nexus between attorney's OWI-third-offense conviction and the practice of law based on grave risk of injury to others and pattern of criminal conduct).

In contrast to the foregoing cases where the attorneys' criminal conduct reflected adversely on their fitness as lawyers, we have stated in dicta that a conviction for assault might not violate rule 32:8.4(b) if it were merely a private dispute and did not otherwise reflect on the

attorney's fitness*:* "[A] lawyer who becomes involved in an isolated incident of assault and battery while drunk, might well be considered unlikely to commit such a violent outburst in his professional life, and thereby not be subject to discipline." *Schmidt,* 796 N.W.2d at 41 (internal quotation marks omitted).

Placing the present case against this legal backdrop, we have no difficulty concluding that Blessum's conviction for assault causing bodily injury reflects adversely on his fitness as a lawyer. First, Blessum made "the conscious decision to act on [his] hostility and assault [Doe] . . . rather than walk away." *Id.* In fact, he forcibly prevented her from leaving while dragging and striking her repeatedly. Second, Blessum showed disrespect for law enforcement by attempting to falsely take credit for summoning the police once he realized Doe had successfully dialed 911. Third, Doe had to go to the hospital because of the physical injuries Blessum inflicted and continued to suffer mental and emotional problems after the assault was over. Fourth, Doe was a client. Had she never retained Blessum as her attorney, she never would have been assaulted by him.

Thus, we agree with the commission that Blessum's conviction for assault causing bodily injury violated rule 32:8.4(j).

**D. Trust Account Practices (Rule 32:1.15(c)).** Rule 32:1.15(c) states, "A lawyer shall deposit into a client trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred." Iowa R. Prof'l Conduct 32:1.15(c). Trust accounts in Iowa are governed by chapter 45 of the Iowa Court Rules. *Id.* r. 32:1.15(f). "A lawyer must deposit advance fee and expense payments from a client into the trust account and may

withdraw such payments only as the fee is earned or the expense is incurred." Iowa Ct. R. 45.7(3).

> A lawyer accepting advance fee or expense payments must notify the client in writing of the time, amount, and purpose of any withdrawal of the fee or expense, together with a complete accounting. The attorney must transmit such notice no later than the date of the withdrawal.

*Id.* r. 45.7(4).[7]

Prematurely withdrawing fees violates rules 32:1.15(c) and 45.7(3). *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Denton*, 814 N.W.2d 548, 551 (Iowa 2012) (noting these rules require flat fees to be deposited in a trust account and withdrawn only when earned); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCuskey*, 814 N.W.2d 250, 256 (Iowa 2012) (stating

---

[7]In its complaint, the Board also cited rules 45.10(1), 45.10(2), and 45.10(3) in connection with Blessum's handling of the $1000 fee from Doe. These rules specifically relate to flat fees and provide as follows:

> **45.10(1)** *Definition.* A flat fee is one that embraces all services that a lawyer is to perform, whether the work be relatively simple or complex.

> **45.10(2)** *When deposit required.* If the client makes an advance payment of a flat fee prior to performance of the services, the lawyer must deposit the fee into the trust account.

> **45.10(3)** *Withdrawal of flat fee.* A lawyer and client may agree as to when, how, and in what proportion the lawyer may withdraw funds from an advance fee payment of a flat fee. The agreement, however, must reasonably protect the client's right to a refund of unearned fees if the lawyer fails to complete the services or the client discharges the lawyer. In no event may the lawyer withdraw unearned fees.

Iowa Ct. R. 45.10.

However, the Board did not refer to these rules in its presentation to the commission. Nor does it mention them in its appellate brief. The commission's decision does not discuss them, either. Therefore, we will not address rules 45.10(1), 45.10(2), or 45.10(3) here. The Board concedes that Blessum initially deposited the fee into his trust account and does not assert Doe and Blessum had a specific agreement regarding its withdrawal. It should be noted that the last sentence of rule 45.10(3) essentially recaps what rule 45.7(3) already provides. *Compare id.* r. 45.10(3) ("In no event may the lawyer withdraw unearned fees."), *with id.* r. 45.7(3) ("A lawyer . . . may withdraw such [advance] payments only as the fee is earned or the expense is incurred.").

rule 32:1.15(c) "requires fees to be withdrawn by the lawyer only as earned"). Failure to render a contemporary accounting when withdrawing a fee violates rules 32:1.15(c) and 45.7(4). *Denton*, 814 N.W.2d at 551; *McCuskey*, 814 N.W.2d at 256.

In his answer to the Board's amended complaint, Blessum admitted the underlying facts that show he improperly handled the $1000 advance fee from Doe. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Nelson*, 838 N.W.2d 528, 532 (Iowa 2013) ("Factual matters admitted by an attorney in an answer are deemed established . . . ."). The evidence and testimony presented at the hearing corroborated that Blessum withdrew the funds before performing the work and without providing an accounting. We therefore conclude Blessum violated rules 32:1.15(c), 45.7(3), and 45.7(4).

### V. Consideration of Appropriate Sanction.

We now consider the appropriate sanction for Blessum's violations. " 'There is no standard sanction for a particular type of misconduct, and though prior cases can be instructive, we ultimately determine an appropriate sanction based on the particular circumstances of each case.' " *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morris*, 847 N.W.2d 428, 435 (Iowa 2014) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007)). We respectfully consider the commission's recommended sanction, but are free to impose a greater or lesser sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 463–64 (Iowa 2014).

> "When crafting a sanction, we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of

the bar as a whole, and any aggravating or mitigating circumstances."

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 660 (Iowa 2013) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Rhinehart*, 827 N.W.2d 169, 182 (Iowa 2013)).

**A. Range of Sanctions for Sexual Relationship with Client.** "Our past cases reveal a broad range of discipline for attorneys who engage in sexual relations with a client.  This range is between a public reprimand and a lengthy period of suspension . . . ."  *Marzen*, 779 N.W.2d at 767.  In *Morrison*, we found an indefinite suspension with no possibility of reinstatement for three months to be an appropriate sanction where the attorney had a consensual sexual relationship with one client in a dissolution matter and had been previously admonished for making sexual advances toward another client.  727 N.W.2d at 119–20.  In cases that involved multiple clients and sex-for-fees arrangements, we have given greater sanctions.  *See, e.g.*, *McGrath*, 713 N.W.2d at 695, 698, 702–04 (suspending attorney's license indefinitely with no possibility of reinstatement for three years for proposing sex-for-fees arrangements with two clients seeking help on custody matters).

Additionally, we have considered the vulnerability of the client to be an aggravating circumstance warranting higher sanctions.  *See Marzen*, 779 N.W.2d at 765, 768–69 (imposing a six-month suspension for attorney's sexual relationship with client he represented in an involuntary mental health commitment proceeding and who he knew was involved in family conflict, including a child custody dispute); *Bowles*, 794 N.W.2d at 7–8 (imposing an eighteen-month suspension for attorney's sexual relationship with a client who had only recently been

discharged from a mental health facility where the attorney also facilitated the client's preparation of a false affidavit).

We have also levied more severe sanctions where sexual relationships were accompanied by sexual harassment and other violations. *Moothart,* 860 N.W.2d at 601 (imposing a thirty-month suspension for attorney's sexual relations with two clients and sexual harassment of those two clients plus three others); *Furlong,* 625 N.W.2d at 713–14 (suspending an attorney for eighteen months for engaging in a sexual relationship with one client and attempting to dissuade her from pursuing an ethics complaint and sexually harassing another client).

In contrast, when the attorney was found to have had sexual relations with only one client and that client suffered no legal, emotional, or physical harm, we have ordered a lesser sanction. *See Monroe*, 784 N.W.2d at 791 (imposing a thirty-day suspension and noting "the misconduct appear[ed] to be an isolated occurrence").

**B. Range of Sanctions for Criminal Conduct Violation.** The range of sanctions for domestic abuse crimes that adversely reflect on an attorney's fitness to practice law is similarly broad. We noted in *Schmidt* our intent to treat domestic violence by attorneys more seriously than we had in the past when a private admonition had sometimes been deemed sufficient: "In light of our determination that domestic abuse violence is a 'reprehensible crime,' we now find that admonishment for such acts [is] inappropriate." 796 N.W.2d at 43. At the same time, we noted that in some prior domestic abuse cases, we had imposed sanctions of up to two years "depending on the nature and extent of other misconduct proved by the board in the same case." *Id.*

In *Schmidt,* we handed down a thirty-day suspension for an attorney who violently assaulted his wife. *Id.* at 38, 45. Despite the

seriousness of the domestic abuse charge, we noted several mitigating factors. *Id.* at 39, 45. Schmidt had begun an intensive rehabilitative program even before the disposition of his criminal case. *Id.* at 39. We also referred to Schmidt's "lack of prior discipline, his taking responsibility for his actions, his remorsefulness," and the substantial evidence that this was "a one-time aberration." *Id.* at 45.

In *Committee on Professional Ethics & Conduct v. Patterson,* we imposed an indefinite suspension with no possibility of reinstatement for three months on an attorney who brutally assaulted a girlfriend who had asked him to represent her, leaving her "a badly disfigured and battered woman." 369 N.W.2d 798, 799, 801 (Iowa 1985). We discounted the attorney's contention that he "lost his reason and ha[d] no recollection of the event." *Id.* at 801.

In another case, we imposed an indefinite suspension with no possibility of reinstatement for six months on an attorney who was convicted of striking his wife in the eye with his fist while intoxicated. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Ruth,* 636 N.W.2d 86, 87, 89 (Iowa 2001). He had also been convicted of third-offense OWI, but we noted as a mitigating circumstance that he had since made great progress in treating his alcoholism. *Id.* at 88–89. In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Polson,* we imposed a two-year suspension on an attorney who assaulted his wife by grabbing her neck and who then violated the court's no-contact orders. 569 N.W.2d 612, 613–14 (Iowa 1997). We were especially troubled by the attorney's lack of respect for the court in repeatedly violating the court's orders. *Id.* at 614.

We put in place an indefinite suspension with no possibility of reinstatement for fourteen months on the attorney in *Committee on*

*Professional Ethics & Conduct v. Lapointe*, 415 N.W.2d 617, 620 (Iowa 1987). That attorney had struck his girlfriend in the stomach and face during an argument. *Id.* at 618. Upon discovering his girlfriend was going to testify at a grand jury proceeding concerning the incident, he drafted a two-page document instructing her on what to say. *Id.* Lapointe was convicted of assault causing bodily injury and tampering with a witness. *Id.* at 619. We noted that the assault was "morally reprehensible" and that the witness-tampering charge constituted an additional violation of our ethical rules at the time. *Id.* at 619–20.

**C. Range of Trust Account Sanctions.** In addressing client trust account violations, our sanctions have ranged from a public reprimand to license revocation depending on the severity of the incident. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 588 (Iowa 2011) (collecting cases demonstrating the broad range of sanctions for trust account violations). Revocation will occur when the attorney "crosses an important line" by misappropriating client funds without a colorable future claim. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kelsen*, 855 N.W.2d 175, 182 (Iowa 2014). At the other end of the spectrum, where the trust account violation is an isolated incident, and the attorney had a colorable future claim to the funds, the appropriate sanction is generally a public reprimand. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kersenbrock*, 821 N.W.2d 415, 422 (Iowa 2012) (noting that "[a] public reprimand might be sufficient sanction" for a trust account violation standing alone and citing cases where this sanction was imposed, but imposing a thirty-day suspension on an attorney who demonstrated "a systematic failure" to comply with trust account requirements).

**D. The Sanction in this Case.** We agree with the commission that a substantial sanction is warranted for Blessum's criminal act victimizing his own client.[8] The recording of Doe's 911 call is very disturbing. The photographs showing Doe's injuries are also quite troubling. Doe was fortunate the police arrived when they did. Blessum's efforts to downplay his actions before the commission, indicating he basically struck Doe only to knock the pills out of her hand and prevent her from committing suicide, fall short of the standards we expect of attorneys. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 128 (Iowa 2013) (deeming an attorney's insistence that he had done nothing wrong, despite obvious ethical misconduct, to be an aggravating factor); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stowers*, 823 N.W.2d 1, 17 (Iowa 2012) ("Minimizing or failing to take responsibility for one's misconduct is an aggravating factor."). It is also disappointing that Blessum appeared to play on Doe's emotions to dissuade her from pressing charges against him after the assault and even instructed her on how to call the courthouse and have the charges dropped. In sum, the totality of Blessum's behavior shows considerable disrespect for the law and the legal system.

We believe this case therefore warrants a much longer suspension than *Schmidt*, our most recent domestic violence case. 796 N.W.2d at 45. Most importantly, *Schmidt* did not involve a client. *See id.* at 38. Thus, unlike in *Schmidt*, we have two distinct, serious rule violations that intersected. Additionally, in *Schmidt*, the attorney voluntarily undertook "intensive rehabilitative efforts" after assaulting his wife,

---

[8]In determining the sanction, we give some but relatively little weight to the trust account violation. Blessum conceded the violation, and there is no dispute he intended to and ultimately did the work for which he had been retained. As just discussed, this violation, if isolated and a first offense, would probably have resulted in a reprimand.

including a ten-day program pertaining to destructive behaviors in Arizona, a domestic abuse and intervention program, parent enrichment classes, anger management as recommended by his children's therapist, and counseling sessions with two different professionals. *Id.* at 39. While Blessum did complete a court-ordered anger management program, paid the court-ordered fine and restitution, and otherwise met the terms of his probation, even at the commission hearing he presented implausible explanations for what happened on June 11, 2012.

For example, he claimed that he said hurtful things to Doe that evening as a deliberate strategy so she would never want to come back. When asked why he can be heard on the 911 recording forcibly restraining Doe and telling her in a vulgar, threatening, and abusive manner that she could not leave the house, while Doe can be heard begging to be permitted to leave, Blessum insisted that he simply did not want Doe to be driving in her condition. These explanations did not ring true to the commission and do not ring true to us. They contrast sharply with Blessum's after-the-fact note to Doe apologizing for "hitting" and "terrorizing" her. In short, we find Blessum's discounting of his actions at the commission hearing to be a significant aggravating factor.

Furthermore, although Blessum asserts he has sought counseling and this should mitigate the severity of the sanction he receives, his testimony at the hearing indicated this therapy was primarily to deal with his personal and marital issues rather than focused on the seriousness of domestic violence and assaultive behavior like the programs Schmidt enrolled in.

There is also evidence that Doe was vulnerable because of conditions known to Blessum.[9] *See Bowles*, 794 N.W.2d at 3–4, 7; *Marzen*, 779 N.W.2d at 765. True, Doe is the only client with whom Blessum is shown to have had a sexual or sexually harassing relationship. *Cf. Moothart*, 860 N.W.2d at 615–17 (sanctioning attorney for sexual relationships and sexual harassment of two clients and sexual harassment of three additional women). But Doe suffered both physical and emotional harm as a result of her relationship with Blessum.

We do find as a mitigating factor that Blessum has no history of violence or domestic abuse, much like the attorney in *Schmidt*, 796 N.W.2d at 44. Blessum also has no record of public discipline.[10]

After weighing the commission's recommendation, the aggravating and mitigating factors, and our precedents, we conclude an indefinite suspension with no possibility of reinstatement for eighteen months is an appropriate sanction in this case.

## VI. Disposition.

We suspend Blessum's license to practice law in Iowa with no possibility of reinstatement for eighteen months. This suspension applies to all facets of the practice of law. *See* Iowa Ct. R. 35.13(3).

---

[9]During the oral argument of this appeal, the Board asserted that Blessum used confidential knowledge he had received from Doe regarding her history of being abused when he victimized her on June 11, 2012. We do not find this particular allegation supported by the record. For example, Doe testified that she told Blessum about her traumatic past around the time they became intimate, but she added that he already knew many of the details from his friendship with Doe's brother-in-law.

[10]At the hearing, Blessum testified he had previously received one private admonition. In his brief to this court, Blessum stated he has received two private admonitions. Private admonitions are not considered discipline. *Van Ginkel*, 809 N.W.2d at 110. Nevertheless we can consider private admonitions as aggravating factors in imposing sanctions because they serve to put an attorney on notice of ethical requirements. *See id.* Here, however, the Board did not present evidence on the subject matter of Blessum's earlier private admonitions and we therefore decline to consider them as aggravating factors in determining the appropriate sanction.

Blessum must comply with rule 35.23 and notify his clients of the suspension. *Id.* r. 35.23(1). Prior to reinstatement, Blessum must establish that he has not practiced law during the period of his suspension, and that he has conformed with the requirements set forth in Iowa Court Rule 35.14. The costs of this proceeding are taxed to Blessum. *See id.* r. 35.27(1).

**LICENSE SUSPENDED.**

All justices concur except Cady, C.J., who takes no part.